# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Crim. No. 10-15 (JNE/JJK) |
| Plaintiff, | |
| v. | |
| 1. Tyvarus Lee Lindsey, also known as Stick, also known as Little Stick; and 2. Rashad Raleigh, also known as Shoddy, | **REPORT AND RECOMMENDATION** |
| Defendants. | |

---

Jeffrey S. Paulsen, Esq., and Christian S. Wilton, Esq., Assistant United States Attorneys, counsel for Plaintiff.

Jon M. Hopeman, Esq., Felhaber Larson Fenlon & Vogt, PA, and Richard Ney, Esq., Ney & Adams, counsel for Defendant Lindsey.

Andrew S. Birrell, Esq., Birrell & Newmark, Ltd., and John R. Martin, Esq., Martin Brothers, PC, counsel for Defendant Raleigh.

---

JEFFREY J. KEYES, United States Magistrate Judge

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................3

BACKGROUND ...........................................................................................................4

I.    The Officers' Entry and Search at the Minneapolis Residence and Defendant Lindsey's Arrest ..................................................................................................5
        Testimony from Officer Ann Martin ...................................................5
        Testimony from Officer Cheri Petersen ...................................................9
        Testimony from Sergeant Bryant Gaden ...................................................11
        Testimony from DaJuan Rayford ...................................................13
        Testimony from Cornelia Travis ...................................................19

II.    The Issuance and Pendency of the Arrest Warrants for Defendant Lindsey, and Defendant Lindsey's and Defendant Raleigh's Statements and Other Information provided to Sergeant Bergren and Special Agent Parker........................20

1

Testimony from Sergeant Thomas Bergren ...............................................21
    A.      Arrest Warrants for Tyvarus Lindsey .............................................22
    B.      March 26, 2007 Interview with Tyvarus Lindsey ............................24
    C.      March 31, 2007 Discussion with Tyronda Lindsey .........................27
    D.      DuJuan Rayford and Defendant Lindsey's addresses ......................28

Testimony from Special Agent Matthew Parker and Sergeant
Bergren regarding Defendant Raleigh's Statements....................................29

III.    Monitoring and Copying Jail Mail and Jail Telephone Calls....................................35
    Testimony from Investigator Donald Rothstein ............................................37
    Testimony from Janet Huber-Loe ..............................................................41
    Testimony from Investigator Vincent Krenz ................................................43
    Testimony from Investigator Michael Sieg ..................................................46

ANALYSIS..............................................................................................................47

I.    Defendant Lindsey's Motions for Suppression .......................................................47
    A.      March 26, 2007 search and seizures at Defendant Lindsey's
                sister's apartment ...............................................................................48
    B.      Defendant Lindsey's statements to Sergeant Bergren ................................58
          (i)      Whether the statements were poisoned fruit from an unlawful
                      search or arrest ...................................................................59
          (ii)     Whether the statements to Sergeant Bergren are inadmissible
                      because of unnecessary delay ......................................................61
          (iii)    Whether the statements in response to Sergeant Bergren's cell-phone
                      questions are inadmissible ..........................................................65
          (iv)    Whether Defendant Lindsey's statements made after invoking his right
                      to counsel are inadmissible........................................................68
    C.      Evidence seized pursuant to the Ramsey County search warrant
                and pen register ...............................................................................70
           (i)      March 27, 2007 search warrant .....................................................70
                    a.      Standing ..................................................................71
                    b.      Probable cause ........................................................72
                    c.      Good-faith exception .................................................78
           (ii)     April 5, 2007 pen register .........................................................79

II.    Defendant Raleigh's Motions for Suppression .......................................................79
    A.      Unnecessary Delay ...........................................................................79
          (i)      Rule 5(a) .............................................................................80
          (ii)     Rule 9 .................................................................................81
          (iii)    Collusion exception ...............................................................83
    B.      Rule 11 and Rule 410 ......................................................................85

III.    Defendant Lindsey's and Defendant Raleigh's Motions to Suppress Based on
    Interception of Jail Calls and Jail Mail ..............................................................94

IV.    Defendant Lindsey's and Defendant Raleigh's Motions for Severance .....................99
    A.      *Bruton* claims ..............................................................................102
    B.      Other arguments .............................................................................104

RECOMMENDATON ......................................................................................107

**INTRODUCTION**

This matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Dist. Minn. Loc. R. 72.1 on the following pretrial motions:

Defendant (1) Tyvarus Lee Lindsey
- Motion for Suppression of Evidence Obtained by Search and Seizure (Doc. No. 107),
- Motion for Severance and for Disclosure of Co-Defendant's Statements (Doc. No. 114), and
- Motion to Suppress Statements with Incorporated Legal Authority (Doc. No. 119).

Defendant (2) Rashad Raleigh
- Motion for Suppression of Evidence Obtained by Search and Seizure (Doc. No. 71),
- Motion to Suppress Statements with Incorporated Legal Authority (Doc. No. 72), and
- Motion for Severance and for *In Camera* Review of Co-Defendant's Statements (Doc. No. 80).

On April 16, May 12, 2010, and June 22, 2010, this Court held a criminal-motions hearing at which the following witnesses testified for the Government: Ann Martin, Bryant Gaden, Donald Rothstein, Janet Huber-Loe, Vincent Krenz, Michael Sieg, Matthew Parker, Thomas Bergren and Cheri Petersen. DaJuan Rayford and Cornelia Travis testified for the defense. This court received numerous exhibits.

Following the hearing, the Court established a post-hearing briefing schedule so that the Defendants could present written argument regarding the above pretrial motions. Each Defendant filed a post-hearing memorandum (Doc.

No. 151, Def. Tyvarus Lindsey's Mem. in Supp. of Pretrial Motions ("Def. Lindsey's Mem."); Doc. No. 149, Def. Raleigh's Mem. in Supp. of His Dispositive ("Def. Raleigh's Mem.")).  The Government filed responses to both submissions. (Doc. No. 158, Post-Hr'g Mem. of the United States in Opp'n to Def.'s Mots. to Suppress Evidence and for Severance ("Gov't Resp. to Lindsey"); Doc. No. 157, Post-Hr'g Mem. of the United States in Opp'n to Def.'s Mots. to Suppress Evidence and for Severance ("Gov't Resp. to Raleigh").)  Defendant Raleigh filed a reply to the Government's response (Doc. No. 169, Def. Raleigh's Reply to Post-Hr'g Mem. of the United States ("Raleigh Reply")), and Defendant Lindsey filed a reply memorandum in support of his pretrial motions (Doc. No. 170, Def. Tyvarus Lindsey's Reply Mem. In Supp. of Pretrial Mots. ("Lindsey Reply")).  For the reasons that follow, this Court recommends that Defendant Lindsey's motion to suppress evidence be denied, motion for severance be denied, and motion to suppress statements be granted in part and denied in part.  This Court also recommends that Defendant Raleigh's motion to suppress evidence be denied, motion to suppress statements be denied, and motion for severance be denied.

## BACKGROUND

The two Defendants named above have been charged with Possession of a Firearm in Furtherance of a Drug Trafficking Offense (the drug-trafficking offense being conspiracy to distribute controlled substances), and three counts of Murder Resulting from the Possession of a Firearm in Furtherance of a Drug

4

Trafficking Offense. (*See* Doc. No. 5.) The charges stem from events that occurred on March 23, 2007, which resulted in the deaths of two adults and one minor.

This Court received the following testimony from various witnesses at the April 16, May 12, and June 22, 2010 criminal-motions hearings regarding several statements made by Defendants and searches and seizures performed by officers.

## I.   The Officers' Entry and Search at the Minneapolis Residence and Defendant Lindsey's Arrest

Minneapolis police officers found and arrested Defendant Lindsey on a warrant on March 26, 2007, at his sister Tyronda Lindsey's home ("the Minneapolis Residence"). In part, Defendant Lindsey moves to suppress any evidence obtained as a result of searches and seizures that occurred on that day, based on his assertion that no one provided the officers with consent to enter the home. The following testimony relates to the events that occurred on March 26, 2007, at the Minneapolis Residence.

### Testimony from Officer Ann Martin

Ann Martin has been an officer with the Minneapolis Police Department for sixteen years, and has been a member of the Violent Crime Apprehension Team for ten years. (Doc. Nos. 143, 145, and 173, 4/16/10, 5/12/10, and 6/22/10 Hr'g

Tr. ("Tr.") 7.)[1]  As a member of that team, Officer Martin investigates and tries to

locate people with outstanding warrants on them.  (*Id.*)  The team usually

operates wearing plain clothes and driving unmarked squad cars, and they

approach residences where a warrant suspect may be located quietly and

without a show of force.  When approaching a house, they knock on the door,

indentify themselves, explain why they are there and who they are looking for,

and generally show a photo of the warrant suspect.  (*Id.* at 8.)   They will then ask

for consent to search the premises.  (*Id.*)  If someone refuses consent, they do

not enter the house, but instead, if they think the target person is in a specific

location, they will then get a warrant for that person.  (*Id.* at 8-9.)  The Violent

Criminal Apprehension Team makes approximately 315 arrests per year.  (*Id.* at

9.)

In March 2007, Officer Martin's supervisor, Sergeant Al Kramer, informed

Officer Martin's unit that Racine County in Wisconsin was trying to locate

someone named Marvin Waldrop for not complying as a sex offender, and

assigned Officer Martin's unit the task of trying to locate him.  (*Id.* at 9-10.)  A

warrant had been issued for his arrest and had been faxed to Sergeant Kramer

on March 6, 2007.  (Gov't Ex. 3; Tr. 18-19.)  Officer Martin searched the

_____

[1]      The April 16, May 12, and June 22, 2010 hearing transcripts are
consecutively paginated.  Therefore, this Court treats the transcripts as one
document and refers to all three using the abbreviation "Tr." throughout.  The
redacted versions of these hearing transcripts can be found at Doc. Nos. 167,
168, and 179, respectively.

Department of Vehicle Services ("DVS") system and learned that the address listed on Waldrop's Minnesota driver's license was for XXXX XXXXXXXX Avenue South, in Minneapolis, Minnesota (the "Minneapolis Residence"). (Tr. at 10.) Sometime between March 6 and March 26, 2007, Officer Martin went to the Minneapolis Residence looking for Waldrop, but no one answered the door. (*Id.* at 18-19.)

On March 26, 2007, Officer Martin, Officer Cheri Petersen, Sergeant Kramer, and Officer Danny Hicks drove to the Minneapolis Residence again and Officer Martin and/or Officer Petersen knocked on the door. (*Id.* at. 11, 27.) Officers Martin and Petersen were dressed in plain clothes and did not have any firearms displayed. (*Id.* at 11.) A black female answered the door, and Officer Martin explained to her that they were there looking for Marvin Waldrop, that he was a noncompliant sex offender from Wisconsin for whom they had a warrant, and that his driver's license had been issued to him at the Minneapolis Residence's address. (*Id.* at 11-12.) Officer Martin asked for consent to look in the home for him, and the black female allowed the officers to enter. (*Id.* at 12.)

Officer Petersen stayed at the front door of the residence while Officer Martin entered the residence and began looking for Waldrop. (*Id.*) The two other officers stayed outside and watched the back and side of the residence. (*Id.* at 19.) When she looked in the main-level bathroom, Officer Martin found a man standing in the bathtub behind the shower curtain, fully clothed, with no water

running in the shower.  (*Id.* at 12.)  Officer Martin asked the man, who was sweating profusely and appeared nervous, to come out of the shower.  (*Id.* at 12-14.)  Once in the living-room area of the house, the man identified himself to Officer Martin as Tyvarus Lindsey.  (*Id.* at 13.)  The name Tyvarus Lindsey sounded familiar to Officer Martin as having been involved in a prior incident; specifically, she had heard the name from her husband, Officer Mike Martin, who works with gang investigations.  (*Id.* at 13.)  Because of the circumstances (i.e., recognizing Defendant's name and seeing him in an unusual place while appearing nervous and sweating), someone within the unit checked for any warrants for Defendant Lindsey.  (*Id.* at 14, 29.)  Officer Martin then learned from a dispatcher that there was a felony warrant out of Ramsey County for Defendant Lindsey's arrest.  (*Id.* at 14, 30.)

Officer Martin notified Sergeant Kramer of the situation, and Sergeant Kramer called the St. Paul Police Department to ask whether it was interested in Lindsey; the St. Paul Police Department indicated that it was.  (*Id.* at 15.)  Prior to going out to the Minneapolis Residence to look for Waldrop on March 26, 2007, Officer Martin had not received any report or warrant request about Defendant Lindsey; she and her colleagues did not go to the Minneapolis Residence to look for Defendant Lindsey.  (*Id.* at 22.)

At that point, Officer Martin handcuffed Defendant Lindsey, pat-searched him, and placed him in Officer's Martin's unmarked vehicle.  (*Id.* at 15.)  During

the pat-search, Officer Martin recovered both a cellular telephone and miscellaneous paperwork from Defendant Lindsey's pants pockets. (*Id.* at 15-16.) She then drove Defendant Lindsey to the St. Paul Police Department headquarters to its homicide unit accompanied by Officer Petersen and Sergeant Kramer, and gave the property seized from Defendant Lindsey's person to Officer Bergren of the St. Paul homicide unit. (*Id.* at 15-16, 24.) From the time that Officer Martin arrived on scene at the Minneapolis Residence to the time she left to transport Defendant Lindsey to the St. Paul Police Station, fifteen minutes had transpired. (*Id.* at 16.) She did not recall if there were any other people in the house other than Defendant Lindsey and the woman who answered the door. (*Id.* at 20.)

### Testimony from Officer Cheri Petersen

Officer Cheri Petersen has worked for the Minneapolis Police Department for approximately eighteen years, and on the Violent Criminal Apprehension Team for about eight years. (*Id.* at 325-26.) On March 26, 2007, Officer Petersen went looking for Marvin Waldrop at the Minneapolis Residence based on a warrant that her supervisor had received from Wisconsin and the fact that the address for this residence was listed on the suspect's driver's license. (*Id.*; *Id.* at 327-28.) She was with Officer Ann Martin, Sergeant Al Kramer, and Officer Danny Hicks. (*Id.* at 327.) They were wearing plainclothes, and had their guns under their jackets and their badges around their necks. (*Id.*) When they arrived

at the residence at approximately 10:15 or 10:30 a.m., Officer Hicks and Sergeant Kramer stood outside, and Officers Martin and Petersen knocked on the front door.  (*Id.*)  Officer Petersen did not remember much detail about the building other than that the unit at issue was on the first floor and that the building could have been a duplex.  (*Id.* at 333.)  Officer Petersen testified that a female answered the door, and that she was sure that it was a female.  (*Id.* at 327.) Officer Petersen told her that they were looking Marvin Waldrop, and asked if they could come in and talk to her.  (*Id.* at 327-28.)  The female then let them in without resistance or hesitation.  (*Id.* at 328.)  Officer Petersen testified that she did not know the woman's name and that she did not remember exactly what she looked like, other than that she was a black adult female.  (*Id.*)  The woman's demeanor was "fine" and "pleasant".  (*Id.*)  She gave Officer Petersen no indication that she was not a resident of the premises, and Officer Petersen thought that she lived there.  (*Id.*)

Once inside, Officer Petersen explained to the woman that they were looking for Martin Waldrop and asked her if he was there and whether she knew of any addresses where the officers might be able to find him if he was not there. (*Id.* at 329.)  The woman responded that Waldrop was not there.  (*Id.*)  Officer Martin then asked her whether she minded if they look around since Waldrop's driver's license indicated that he lived at the Minneapolis Residence.  (*Id.*)  The woman said that was fine.  (*Id.*)  While Officer Petersen continued talking to the

woman who answered the door, Officer Martin looked around the interior. (*Id.*) Officer Martin found Defendant Lindsey in the bathroom shower, sweating profusely. (*Id.*) Because the officers thought it was suspicious that he was sweating so much, they checked for warrants, and learned that there was a warrant out on him. (*Id.*) At that point, the officers arrested Defendant Lindsey. (*Id.*) Officer Petersen testified that she does not remember how Defendant Lindsey was dressed, whether he had glasses on, or whether he had a brace on his wrist. (*Id.* at 334.) She also does not remember there being any other people in the house other than Defendant Lindsey. (*Id.* at 329.)

### Testimony from Sergeant Bryant Gaden

Sergeant Bryant Gaden has been an officer with the St. Paul Police Department for fifteen years, and has been working in the Homicide Division for six years. (*Id.* at 33-34.) On March 26, 2007, he and St. Paul Police Officer Munoz went to the Minneapolis Residence where Defendant Lindsey was arrested for the purpose of investigating a vehicle that had been left there. (*Id.* at 34.) Because Defendant Lindsey has withdrawn any challenge to the search of that vehicle (*see* Doc. No. 140, 5/19/10 Order at 7), the Court omits a summary of Sergeant Gaden's testimony regarding the investigation of that vehicle here.

Sergeant Gaden testified that the St. Paul Police Department had a "pickup order" out for Tyvarus Lindsey at the time of his arrest. (*Id.* at 45.) A "pickup order" is issued by the police department, but not signed by a judge, as

an instruction to anyone in the police department who encounters a person so designated to pick them up and bring them to St. Paul Police Headquarters for questioning.  (*Id.*)

Sergeant Gaden and Officer Munoz went to the Minneapolis Residence after Defendant Lindsey had been arrested and knocked on the door.  (*Id.* at 36.) Defendant Lindsey's sister, Tyronda Lindsey, who was a resident of the home, allowed them in.  (*Id.*)  The officers explained to her that they were looking for some items that may have been stolen, and she agreed to let Sergeant Gaden and the other officers walk around to check for those items.  (*Id.* at 36-37.) Sergeant Gaden wrote in his report that Tyronda Lindsey reported to him that "[s]he had just gotten home from work as [Tyvarus Lindsey] was being taken away by police."  (*Id.* at 42.)

Sergeant Gaden explained at the hearing that a certain television set was reported stolen from the scene of the triple murder, but that he did not find a television set of that kind at the Minneapolis Residence.  (*Id.* at 37-38.)  Sergeant Gaden did, however, locate a dark-colored bandanna in the living-room area on a table in plain view.  (*Id.* at 43.)  He asked Tyronda Lindsey for consent to take the bandanna from the residence because he had information that the assailants in the triple murder were wearing either bandannas or masks around the lower part of their faces.  (*Id.* at 38.)  And when Sergeant Gaden saw the bandanna in Lindsey's sister's home, it appeared to have been folded in such a way that it

could have been worn as a mask around the lower part of the face. (*Id.*)

Tyronda Lindsey gave Sergeant Gaden her consent to take the bandanna, but

claimed that it belonged to her child. (*Id.* at 39.) Sergeant Gaden took the

bandanna from the residence and turned it into the property room. (*Id.* at 39-40.)

### Testimony from DaJuan Rayford

DaJuan Rayford is currently a full-time college student at North Hennepin

Community College, and is the father to Tyronda Lindsey's youngest daughter.

(*Id.* at 286-87.) As stated above, Tyronda Lindsey is Defendant Lindsey's sister.

(*Id.* at 287.) Mr. Rayford has known Defendant Lindsey for at least six years,

which includes the entire time he has been dating Defendant Lindsey's sister,

and he thinks of Defendant Lindsey as a brother-in-law. (*Id.* at 311.) In 2007,

Mr. Rayford was living with Tyronda Lindsey at the Minneapolis Residence, the

home where Defendant Lindsey was ultimately arrested. (*Id.* at 288.) This home

was the lower apartment in a two-apartment, up-down duplex. (*Id.*) The

apartment was small and had a living room and dining room near the front door,

a small kitchen that lead to the back door and basement, and two bedrooms

facing each other with a bathroom between them. (*Id.* at 289.) Mr. Rayford

testified that both he and Tyronda Lindsey were listed on the lease and rented

the apartment.[2] (*Id.* at 289, 308.) As of March 26, 2007, they had rented the

---

[2]    The Government contests this fact because Defendant Lindsey has been
unable to procure a copy of the lease.

apartment for at least a year.  (*Id.* at 291.)

Mr. Rayford testified that Defendant Lindsey had been staying at the apartment for months prior to March 26, 2007, "on and off, whenever he wanted to," and that he stayed there the majority of the nights.  (*Id.* at 290-91, 311.)  As of March 26, 2007, Defendant Lindsey had been staying there for some weeks.  (*Id.* at 291.)  Neither Defendant Lindsey nor his girlfriend Candice Jones had a key to the apartment, but Defendant Lindsey could come and go as he pleased.  (*Id.* at 291-92.)

On March 26, 2007, Mr. Rayford, Tyronda Lindsey, her oldest daughter (who is approximately 15 or 16), their youngest daughter (who was approximately one year old), Defendant Lindsey, and Candice Jones were staying at the Minneapolis Residence.  (*Id.* at 290-91, 293.)  The night before, Tyronda Lindsey's oldest daughter slept on the couch, Defendant Lindsey and Candice slept in the oldest daughter's bedroom, and Mr. Rayford, Tyronda Lindsey, and their youngest daughter slept in their bedroom.  (*Id.* at 292.)  On the morning of March 26, 2007, Mr. Rayford dropped Tyronda off at work at approximately 8:00 a.m. at a SuperAmerica that is approximately a five-minute drive from their apartment.  (*Id.* at 293.)  Tyronda Lindsey's oldest daughter went to school when Mr. Rayford was dropping Tyronda Lindsey off at work.  (*Id.* at 298.)  Mr. Rayford can not remember whether he took the oldest daughter to school that day or not.  (*Id.*)  Mr. Rayford then returned home with his youngest

daughter.  (*Id.* at 294.)

After being home for a couple hours, while in his bedroom with his youngest daughter, he heard banging on the front door.  (*Id.* at 294, 298.)  When he got to the door, he saw that it was a "white lady" banging on the door saying that "they were the police."  (*Id.* at 294.)  When he opened the door, the policewoman had her hand on her gun on her hip and said that she had a warrant for Marvin.[3]  (*Id.* at 295-96.)  After she said that she had a warrant, "[Mr. Rayford] had told her that [Marvin] don't stay here.  He's not here, and he ain't stayed here in months[.]"  (*Id.* at 295.)  Mr. Rayford testified that the officer said "well, she still got to come and look - - I mean, come in and see.  And she just walked right - - like, walked - - came in the door."  (*Id.* at 295.)  This officer then walked right by him into the house and then at least one other officer came in too.  (*Id.* at 295-96.)  Mr. Rayford said these other officers were probably another "white lady" and probably another man, and they were wearing jackets with chains around their necks, but not blue police uniform shirts.  (*Id.* at 296.)

---

[3]     Mr. Rayford testified that he knew who Marvin was, that Marvin had lived at the Minneapolis Residence for about a month, and that Marvin had left approximately three months prior to March 26, 2007.  (*Id.* at 301-02.) Mr. Rayford also testified that the police had been to the apartment once before looking for Marvin, approximately one month prior to March 26, 2007.  (*Id.* at 302.)  During this prior visit, the police came when Mr. Rayford was outside barbecuing, and they said they were looking for Marvin.  (*Id.* at 302.)  The police also stated something like, "we'll be back, . . . because we [are] looking for him." (*Id.*)  Mr. Rayford told the police that Marvin did not live there and that he had left and went back to wherever he came from.  (*Id.*)  The police did not enter the apartment during this earlier visit.  (*Id.*)

None of the officers had their guns drawn.  (*Id.*)  When asked whether any of the officers asked for his permission to enter, Mr. Rayford stated, "No. They just said they had the warrant, and we got to look, and they just came in."  (*Id.* at 297.) The officers did not ask anyone else in the apartment for permission to enter, and they did not ask Mr. Rayford or anyone else for permission to search.  (*Id.*)

Later in Mr. Rayford's testimony, he stated that when the lady officer said that she was looking for Marvin and that she had a warrant to see if he was there, Mr. Rayford was "quiet and let the lady do what she said she had to do[.]" (*Id.* at 314.)  He did not say anything back to the officers; he "just stepped back[,]" and "told her that Marvin was not here."  (*Id.*)  The officer then said that she still had to come in and make sure.  (*Id.* at 314-15.)  Mr. Rayford confirmed that at that point he "backed up" and did not say anything; he "just let her do what she said she had to do."  (*Id.* at 316.)[4]

Approximately thirty seconds after the officers had entered, the "white lady" had Defendant Lindsey cuffed, standing at the front living-room table, and was searching him.  (*Id.* at 298-99.)  Mr. Rayford said that he believed that at the time the officers entered that Candice Jones and Defendant Lindsey were lying down in the back bedroom, which was Tyronda's oldest daughter's room.  (*Id.* at 297-98, 312.)  Mr. Rayford saw the officer search Defendant Lindsey and take some

---

[4]     Officer Cheri Petersen began her testimony by stating that she saw Mr. Rayford as he was leaving the courtroom and she did not recognize him. (*Id.* at 326.)

papers out of his pocket and put them on the table, but did not see the officers take a cell telephone from him.  (*Id.* at 299.)  Mr. Rayford also observed Defendant Lindsey provide his name to the officers, and saw the officers use their walkie-talkies to "run his name."  (*Id.* at 300.)  The officers then took Defendant Lindsey outside.  (*Id.*)

Once the police came in the residence, Mr. Rayford called Tyronda Lindsey at her work and told her that the police were there looking for Marvin and that they had taken her brother outside.  (*Id.* at 300-01.)  Mr. Rayford claims that Tyronda had left her cell phone at the house on the table that morning.  (*Id.* at 300.)  Tyronda Lindsey arrived at the apartment approximately ten to fifteen minutes later by taking a cab.  (*Id.* at 301, 313.)  When Tyronda arrived, Defendant Lindsey was already outside in the officers' car.  (*Id.* at 301.)

Approximately ten to fifteen minutes after Defendant Lindsey was brought out to the officers' car, St. Paul Police officers arrived at the Minneapolis Residence.  (*Id.* at 303.)  The St. Paul Police officers did not ask Mr. Rayford for permission to enter or search the apartment, but instead came in with the other officers.  (*Id.* at 304-05.)  The St. Paul Police were in the apartment and had looked around for approximately five minutes before Tyronda returned home. (*Id.* at 304.)  Once Tyronda was home, Mr. Rayford observed a "[b]ig, black bald-headed officer" come through the door and state that he wanted to go through her house and look at her TVs.  (*Id.* at 305.)  Tyronda told the officer that he

could.  (*Id.*)[5]  The officer then asked Tyronda if he could have the scarf/bandana that he had found on the table in the front room.  (*Id.* at 306.)  Tyronda responded that it was her daughter's, but that he could take it.  (*Id.*)

On cross-examination, Mr. Rayford testified about his criminal record.  He was convicted in 2003 for possession of narcotics, for which he went to treatment and went on probation.  A few months before March 26, 2007, the day of Defendant Lindsey's arrest, he was jailed for violating his probation for not reporting and having dirty UAs, and he was later charged with providing false information to police.  (*Id.* at 309, 311, 320.)  The latter charge stemmed from Mr. Rayford providing police with an incorrect name and address; the address provided was XXX XXXXX Street, Apartment XX, in St. Paul, Minnesota ("Mr. Rayford's St. Paul address"), which was his uncle's house and was where he had mail and probation information sent.  (*Id.* at 310.)  Mr. Rayford was also arrested on drug charges on February 27, 2007, and the booking sheet for that arrest reflects his address as Mr. Rayford's St. Paul address.  (Gov't Ex. 24.)  On March 31, 2007, when Mr. Rayford and Tyronda Lindsey went to bail Defendant Lindsey out, Mr. Rayford was arrested on a warrant relating to the providing-false-information-to-police charge to which he pleaded guilty.  (*Id.* at 321.)

---

[5]  Mr. Rayford later testified that Tyronda never consented to let this officer (Officer Gaden) come in.  (*Id.* at 314.)  He stated that Officer Gaden opened the door, told them who he was and that he was with the Ramsey County Police, and that he came in on his own.  (*Id.*)

**Testimony from Cornelia Travis**

Cornelia Travis (otherwise known as Lady Travis) has lived in Minneapolis/St. Paul since 1976.  She was a federal employee of twenty-nine years for the VA Hospital before retiring, and currently owns a beauty shop. (*Id.* at 383-84.)  In 2007, Ms. Travis owned a rental property in Minneapolis, which was a duplex and included the "Minneapolis Residence" referenced above. (*Id.* at 384-85.)

At one point, Ms. Travis had other records showing who had rented the Minneapolis Residence, which included leases and rental applications, but she does not have those records anymore; after the tenants had moved out and after she then sold the building, she saw no reason to keep them.  (*Id.* at 386.) Recently, however, Tyronda Lindsey and DaJuan Rayford came to her and asked her for a copy of their lease.  (*Id.* at 387.)  Ms. Travis went through her files (i.e., a book where she kept former leases), and found a copy of their rental application, but did not find their lease; it had been misplaced.  (*Id.* at 387, 393-94.)

Ms. Travis recalled that Tyronda had gotten a blank application form from her, and then returned it to her on July 20, 2006, filled out with both Tyronda and Mr. Rayford's names listed on it as the applicants.  (*Id.* at 387-88.)  Their move-in date was listed as August 1, 2006.  (*Id.* at 388.)  Ms. Travis also recalled that there was a lease signed by both Tyronda and Mr. Rayford.  (*Id.* at 388-89, 394-

95.)  Tyronda and Mr. Rayford rented the apartment for approximately one year.  (*Id.* at 389.)  Ms. Travis understood that Tyronda, her children, and Mr. Rayford were staying there during the time they rented the unit.  (*Id.*)  No one had applied to have Tyvarus Lindsey or Candice Jones live there.  (*Id.* at 397.)

At the hearing, Ms. Travis identified DuJuan Rayford in court as the person who had signed the application for the Minneapolis Residence and the person who brought her money for the rent.  (*Id.* at 390.)  Most of the time Mr. Rayford brought Ms. Travis the rent money in cash to her beauty shop.  (*Id.* at 391.)  While Mr. Rayford and Tyronda were tenants, Ms. Travis went over to the Minneapolis Residence approximately three times to collect the rent.  (*Id.* at 392.)  On those occasions, she saw Tyronda and Mr. Rayford there, but she never saw Tyvarus Lindsey or Candice Jones.  (*Id.* at 397.)  Nor did Tyronda or Mr. Rayford ever tell her that two other adult people would be staying there for a number of months.  (*Id.* at 398.)  Ms. Travis was also unaware that Marvin Waldrop was living in that unit.  (*Id.* at 400.)  Ms. Travis testified that she would not have wanted to know in advance from her tenants when they were having overnight guests.  (*Id.*)

## II.  The Issuance and Pendency of the Arrest Warrants for Defendant Lindsey, and Defendant Lindsey's and Defendant Raleigh's Statements and Other Information provided to Sergeant Bergren and Special Agent Parker

As mentioned above, Officers Martin and Petersen found and arrested Defendant Lindsey on a warrant on March 26, 2007.  In addition to basing his

motion on his assertion that no one provided the officers with consent to enter the home, Defendant Lindsey bases his suppression motion on his assertion that there was no active warrant for his arrest at the time. The following testimony from Sergeant Thomas Bergren relates to his knowledge of the arrest warrants for Defendant Lindsey, his research conducted as to Defendant Lindsey's and Mr. Rayford's record addresses (which relates to the issues of whether Defendant Lindsey has standing to challenge the search, and whether Mr. Rayford lived at the Minneapolis Residence and therefore would have had authority to consent to the officers' entry), and his conversation with Tyronda Lindsey a few days after Defendant Lindsey's arrest (which relates to whether consent was given to enter and search her home on March 26, 2007).

In addition, both Defendant Lindsey and Defendant Raleigh have brought motions to suppress certain statements that they made to Sergeant Bergren and Special Agent Matthew Parker during the investigation of this case. The following testimony also relates to those statements and the circumstances in which they were given.

### Testimony from Sergeant Thomas Bergren

Sergeant Thomas Bergren works for the St. Paul Police Department, and he has been a law-enforcement officer for thirty years. (*Id.* at 207.) He was the case agent in the Porter murder case, which was a case where Defendant Raleigh entered a plea in the fall of 2008, for which he is currently serving a life-

without-parole sentence.  (*Id.* at 236, 241-42.)  And after the triple murder occurred on March 23, 2007, Sergeant Bergren was the original state investigator assigned to the triple-murder case.  (*Id.* at 207.)  For approximately the past year or so, Sergeant Bergren has been a task-force officer for the task force that handles the joint investigation of potential federal crimes, but he has not officially been sworn in as such.  (*Id.* at 208.)

### A.     Arrest Warrants for Tyvarus Lindsey

As mentioned above, after Officers Martin and Petersen found Defendant Lindsey in the Minneapolis Residence fully clothed, standing in the shower, sweating profusely, and appearing nervous, someone within the unit ran a check for warrants on him.  A dispatcher relayed that there was a felony warrant out of Ramsey County for Defendant Lindsey's arrest.  At that point, Officer Martin handcuffed Defendant Lindsey, pat-searched him, and placed him under arrest. Defendant Lindsey contests whether there actually was an active warrant for his arrest on March 26, 2007.  Specifically, he contends that all warrants for his arrest had been satisfied prior to March 26, 2007.

Defendant Lindsey offered two exhibits at the hearing reflecting arrest warrants for himself.  (*Id.* at 227; *see* Lindsey Exs. 1, 2.)  Exhibit 1 shows that the charge for which the warrant was issued was fleeing the police in a motor vehicle.  (Tr. at 227-28.)  Sergeant Bergren agreed that it was possible that this warrant was originally ordered by Ramsey County District Court Judge Rosas on

22

December 19, 2006, when Defendant Lindsey failed to appear in court. (*Id.* at 229.) Exhibit 2 is a warrant issued by Ramsey County District Court Judge Flynn after Defendant Lindsey failed to appear on the fleeing-the-police charge on March 8, 2007 ("the March 8, 2007 warrant"). (*Id.* at 230.) Defendant Lindsey also offered a search warrant that was issued on March 9, 2007, based on the affidavit of St. Paul Police Sergeant PT Englund, by Ramsey County Judge Rosas for an oral DNA swab from Defendant Lindsey in connection with a firearms violation. (*Id.*; *see* Lindsey Ex. 3.) Sergeant Englund states in the affidavit that the St. Paul police department had issued a probable-cause "pickup and hold" for Tyvarus Lindsey for possession of a firearm by an ineligible person. (Tr. at 231.) Sergeant Englund requests that should Defendant Lindsey be apprehended in Ramsey County, he be searched for the DNA sample. (*Id.* at 231-32.) In the inventory and return from this search warrant, Sergeant Englund states that she took a DNA sample from Defendant Lindsey on March 11, 2007. (*Id.* at 232.) The inventory and return, however, does not say whether Defendant Lindsey was in court that day. (*Id.* at 280.) Sergeant Bergren testified that it would be possible for someone to go out to wherever they thought Defendant Lindsey was living and encounter him there to get a DNA sample, and that he did not necessarily have to be brought to court. (*Id.*)[6]

---

[6]     Lindsey Exhibit 10, however, is a certification from Ramsey County Sheriff Bob Fletcher, which certifies that the records of the Ramsey County Adult Detention Center show that Defendant Lindsey was in the facility from March 9

(Footnote Continued on Next Page)

Sergeant Bergren testified that there was a warrant for Defendant Lindsey's arrest on March 26, 2007.  (*Id.* at 274.)  Because the pretrial papers here suggested the warrant may have been satisfied, Sergeant Bergren did some research to find out whether the warrant had been satisfied as of March 26, 2007.  (*Id.*)  He contacted the Ramsey County Clerk of Court and obtained a computer printout that pertains to the March 8, 2007 warrant.  (*Id.* at 275; *see also* Gov't Ex. 23.)  The printout states that the warrant was active as of March 8, 2007, and that it was satisfied on March 27, 2007, which was the day after Defendant Lindsey was arrested on this case.  (Tr. at 276; *see also* Gov't Ex. 23.)  Sergeant Bergren asked the Clerk of Courts why there were two warrants out in the same fleeing-the-police case, and the clerk told Sergeant Bergren that she did not understand the situation, but that the warrant was active at that time.  (Tr. at 278.)

## B.    March 26, 2007 Interview with Tyvarus Lindsey

On March 26, 2007, Minneapolis Police Sergeant Al Kramer called St. Paul Police Commander Korus to tell him that Tyvarus Lindsey was in their custody.  (*Id.* at 209.)  Commander Korus then contacted Sergeant Bergren and told him that Minneapolis Police had encountered Defendant Lindsey in Minneapolis and that there was a warrant out for Lindsey's arrest.  (*Id.* at 208.)  Because

---

(Footnote Continued from Previous Page)
through March 11, 2007.  (Lindsey Ex. 10.)

Commander Korus knew that Defendant Lindsey's name had come up in the investigation of the triple murder, he asked Sergeant Bergren whether he would like Defendant Lindsey brought to St. Paul headquarters. (*Id.* at 208-09.) Sergeant Bergen responded that he wanted to talk to Defendant Lindsey. (*Id.* at 209.)

The Minneapolis officers brought Defendant Lindsey to St. Paul headquarters, and starting at 11:44 a.m., Sergeant Bergren interviewed him in the interview room in the St. Paul homicide unit for approximately ten minutes. (*Id.* at 209-10, 212.) The interview was both audio and videotaped. (*Id.* at 209-10.) Sergeant Bergren began by asking Defendant Lindsey some preliminary booking questions corresponding to blanks listed at the top of a *Miranda* form. (*Id.* at 110, 217.) He asked Defendant Lindsey his name and date of birth, and then asked him whether he had a cell-phone number. (*Id.* at 217-18.) Sergeant Bergren knew that the officers had seized a cell phone from Defendant Lindsey at the time of his arrest, and he was interested in the phone and he wanted to know who had been using it.[7] (*Id.* at 217-18.) Defendant Lindsey responded that he did not have one. (Gov't Ex. 6.) Sergeant Bergren then asked Defendant

---

[7]    When Officer Ann Martin brought Defendant Lindsey to the St. Paul homicide unit for questioning, she turned over the property that she had taken from Defendant Lindsey at the time of his arrest to Sergeant Bergren; that property included a cell phone, someone else's driver's license, a small bag of marijuana, lip balm, and $10 in cash. (*Id.* at 223.) Sergeant Bergren placed the property in his locked desk drawer, and turned it into the property room the next day, March 27, 2007. (*Id.* at 224.)

Lindsey "what cell phone you using right now?" and "you got a girl?" (*Id.*) Defendant Lindsey responded that the cell phone belonged to his sister, he was keeping it from the kids because they were playing with it, and that it was locked. (Tr. at 218.) Sergeant Bergren did not ask any other preliminary background questions, such as what Defendant Lindsey's address was, his marital status, his employment, or his education. (*Id.* at 217.)

After the exchange about the cell phone, Sergeant Bergren advised Defendant Lindsey of his *Miranda* rights. (*Id.* at 110.) He specifically read Defendant Lindsey each of the rights on the *Miranda* form, and Defendant Lindsey initialed them as he went along and signed the bottom of the form. (*Id.* at 111; *see also* Gov't Ex. 5.)

During the first few minutes of the interview after the *Miranda* warning, Defendant Lindsey did not ask for a lawyer and did not ask that the interview be stopped. (Tr. at 213.) Sergeant Bergren did not threaten him in any way to get him to talk, nor did he promise him anything. (*Id.*) During these first few minutes Sergeant Bergren did not question Defendant Lindsey about the specifics of the triple murder, but instead asked him about his wrist and the brace on his wrist. (*Id.* at 213-14, 217.) Defendant Lindsey told Sergeant Bergren that the wrist brace he was wearing during the interview was not located in the glove box of a car outside the Minneapolis Residence at the time of his arrest, but rather was in the house and had been retrieved from the house by one of the officers who took

him into custody.  (*Id.* at 217.)

Sergeant Bergren then asked Defendant Lindsey whether he had any connection to any vehicles that were parked at the address in Minneapolis where he was arrested.  (*Id.* at 212.)  Defendant Lindsey told Sergeant Bergren that he wanted him to be more specific.  (*Id.*)  Sergeant Bergren took a break to step out to talk with Sergeant Kramer about the exact model and make of a particular vehicle.  (*Id.*)  When Sergeant Bergren came back in the interview room, which was approximately three minutes into the interview, Defendant Lindsey asked Sergeant Bergren if he thought it would be okay if he contacted or called a lawyer.  (*Id.*)[8]

After the interview, Officer Rust came into the room to re-handcuff Defendant Lindsey and take him out.  (*Id.* at 225.)  Officer Rust seized the blue and black, size nine tennis shoes that Defendant Lindsey was wearing.  (*Id.*)

### C.      March 31, 2007 Discussion with Tyronda Lindsey

On March 31, 2007, Tyronda Lindsey came to the police station to post Defendant Lindsey's bail.  (*Id.* at 233.)  At that time, Sergeant Bergren discussed with her Defendant Lindsey's arrest at her house on March 26, 2007.  During their conversation, Tyronda did not tell Sergeant Bergren that she had consented

---

[8]      The Government does not intend to use in their case-in-chief anything during this interview that happened after Defendant Lindsey stated that he wanted to talk to a lawyer.  (*Id.* at 213.)  Therefore, the Court provides no further summary of the interview here.

to the officer's original entry of her house on March 26, 2007. (*Id.* at 235.)[9]

Sergeant Bergren is also not aware of any written consent that was given by anyone on March 26, 2007, that allowed the officers to enter and search Tyronda's apartment. (*Id.* at 236.) During Sergeant Bergren's discussion with Tyronda, he asked her if she had agreed that the St. Paul Police officers could search her place for televisions. (*Id.* at 234.) She told him that she had told the officers (i.e., Sergeant Gaden) that they could search for TVs. (*Id.*) This occurred after Defendant Lindsey's arrest. (*Id.*) Sergeant Bergren also asked Tyronda if she had given the officers permission to seize a bandanna. (*Id.* at 235.) Tyronda stated that the officers had seen a bandanna and seized it. (*Id.*) When asked whose bandanna it was, Tyronda said that it was her daughter's. (*Id.*)

### D.     DuJuan Rayford and Defendant Lindsey's addresses

After the May 12, 2010 hearing, but before the June 22, 2010 hearing, Sergeant Bergren researched documentation concerning where Mr. Rayford had been living during the relevant time periods. (*Id.* at 402.) Police records from Mr. Rayford's February 2007 arrest for a narcotics violation listed Mr. Rayford's address as his St. Paul address referenced above, and his motor-vehicle

---

[9]     It is unclear from the testimony whether Sergeant Bergren actually asked Tyronda whether she gave consent and she said that she did not, or whether Sergeant Bergren's testimony reflects that the topic of whether Tyronda gave consent never came up in their discussion.

registration records showed the Minneapolis Residence as his address in February 2007.  (*Id.* at 402-03, 405; Gov't Ex. 24.)  Sergeant Bergren did not find any information linking Mr. Rayford to the Minneapolis Residence in any of his arrest or jail records.  (Tr. at 404.)  He acknowledged, however, that it is possible that sometimes a police officer might just incorporate the previous address from a previous arrest at the time of booking.  (*Id.* at 410.)  Sergeant Bergren spoke to Mr. Rayford's uncle, who lived at "the St. Paul address," and he stated that Mr. Rayford had not been staying there for quite sometime.  (*Id.*)  And Ms. Cornelia Travis told Sergeant Bergren that Mr. Rayford had been living in her building (i.e., the Minneapolis Residence).  (*Id.*)

Sergeant Bergren also did not find any information linking Defendant Lindsey to the Minneapolis Residence in any of Defendant Lindsey's police records or documentations.  (*Id.* at 405; *see also id.* at 414; Gov't Ex. 27.)  The booking sheet for the day Defendant Lindsey was arrested at the Minneapolis Residence, listed XXXX XXXXXXXXXX Road, St. Paul, Minnesota, as his address.  (*Id.* at 405-06.)  Officer Rust, the arresting officer who filled out the booking sheet, told Sergeant Bergren that this St. Paul address was the address that Defendant Lindsey had given at the time of booking.  (*Id.* at 406-07.)

### Testimony from Special Agent Matthew Parker and Sergeant Bergren regarding Defendant Raleigh's Statements

Special Agent Matthew Parker has been an FBI agent for eleven years, and he is the main federal case agent on this case.  (*Id.* at 140.)  He first became

involved in the investigation of this case within a couple of months of the triple murder on March 23, 2007. (*Id.* at 150-51.) Agent Parker and/or Sergeant Bergren spoke with Defendant Raleigh on three occasions prior to January 25, 2010. Sometime prior to January 2009, Sergeant Bergren spoke with Defendant Raleigh alone, but in January 2009, and then in October 2009, they spoke with Defendant Raleigh together. (*Id.* at 141.) During these meetings, Defendant Raleigh was confined in state prison serving a life sentence for an unrelated murder.[10] (*Id.* at 140, 144.)

During the January 2009 meeting, Defendant Raleigh told Sergeant Bergren and Agent Parker that he was not ready to talk about the triple murder, he made no statements or admissions of any kind about the triple murder, and the officers only discussed other things unrelated to the triple-murder investigation with Defendant Raleigh. (*Id.* at 142.) At the end of the conversation, Sergeant Bergren asked him if he would mind if he and Agent Parker came to see him again. (*Id.* at 143; 165.) Defendant Raleigh said that would be fine. (*Id.* at 143.)

During the October 2009 meeting, Defendant Raleigh again told Sergeant Bergren and Agent Parker that he did not want to talk about the triple murders, and the officers thereafter discussed a few issues unrelated to the case with

---

[10]     Defendant entered a plea in this other matter, and Agent Parker was aware that part of that plea was that Defendant Raleigh would not be prosecuted on the triple-murder case in state court. (*Id.* at 156.)

Defendant Raleigh.  (*Id.* at 144.)  Agent Parker testified that at the end of this conversation, Sergeant Bergren asked Defendant Raleigh if he minded if they came to see him again.  (*Id.*)  Defendant Raleigh apparently said "no, that it was actually nice to talk to somebody." (*Id.*)  This statement was not reported in Agent Parker's 302, which he prepared after the meeting.[11]  (*Id.* at 172.)  At the time, Defendant Raleigh was in solitary confinement.  (*Id.* at 144.)  The officers did not provide *Miranda* warnings at either the January or October 2009 meetings.  (*Id.* at 163.)

On Monday, January 25, 2010, Agent Parker and Sergeant Bergren interviewed Defendant Raleigh at Oak Park Heights prison.  (*Id.* at 140, 144.)  A federal grand jury returned an Indictment in the triple murder case either the Wednesday or Thursday of the previous week.  (*Id.* at 140-41.)  Defendant Raleigh was not brought to federal court immediately after the Indictment was returned because a writ had to be obtained and arrangements had to be made for a SWAT team to transport him to the federal courthouse.  (*Id.* at 141.)  Assistant United States Attorney Jeffrey S. Paulsen applied for the writ, which was granted, on Friday, January 22, 2010, to secure Defendant Raleigh's appearance on Tuesday, January 26, 2010, before the Honorable Arthur J.

---

[11]    After meetings or interviews, Agent Parker goes back to his office and types up an "FBI 302," which becomes the record of the interview or meeting and includes everything that Agent Parker recalls, but it is not meant to be a verbatim transcript of what happened.  (*Id.* at 158-60.)

Boylan.  (*Id.* at 178; Raleigh Ex. 4.)

On Monday morning, January 25, 2010, Agent Parker spoke with Sergeant Bergren.  (Tr. at 141.)  Agent Parker testified that they decided that since they had Monday free, they might as well try talking to Defendant Raleigh one more time.  (*Id.* at 141; *see also id.* at 179.)  Agent Parker knew that Defendant Raleigh was going to have a court appearance the next day, January 26, 2010, and that at that time Defendant Raleigh would be advised of his rights and afforded the opportunity to have counsel appointed if he was eligible.  (*Id.* at 178.)  Agent Parker did not, however, inform Attorney Paulsen on Monday, January 25, 2010, that he and Sergeant Bergren were going to Oak Park Heights to see if Defendant Raleigh would talk to them.  (*Id.* at 179.)

Once at the prison, Agent Parker and Sergeant Bergren met with Defendant Raleigh and asked him if he had seen or been notified about the Indictment.  (*Id.* at 145.)  He told the officers that he had, and he asked why they were there.  (*Id.*)  The officers said that they wanted to question him about the case.  (*Id.* at 145, 188.)  Defendant Raleigh then started talking about the case and made certain admissions.  (*Id.* at 145.)  Specifically, Agent Parker reported that Defendant Raleigh said that "he would be willing to plead out or tap out, and he wanted to know what the best- and worst-case scenarios would be if he pleaded guilty."  (*Id.* at 189.)  At that point, the officers stopped him and told him that before they got into having any discussions about the case, they needed to

read him his *Miranda* rights and complete a *Miranda* waiver form. (*Id.* at 145, 189-90; *see* Gov't Ex. 22.) Agent Parker then read Defendant Raleigh his *Miranda* rights off of a form FD-395 (i.e. Advise-of-Rights form). (Tr. at 145.) Defendant Raleigh told the officers that he understood it, and then he signed the *Miranda* waiver. (*Id.*; *see* Gov't Ex. 22.) The officers then continued their conversation with him, which lasted twenty minutes. (Tr. at 145, 149.)

Defendant Raleigh again stated that "he would be willing to tap out" (i.e., plea or give up), and asked what possible punishments there might be in the case. (*Id.* at 147.) Defendant Raleigh stated that he would "tell on himself," discuss his role in the case, and take a plea, but that he would not talk or give testimony about or against others. (*Id.* at 147, 190.) Agent Parker testified that he was not authorized to enter into plea negotiations and did not raise the issue of a plea with Defendant Raleigh. (*Id.* at 204.) Agent Parker told Defendant Raleigh that if he pleaded, he would have to give a statement about what he did, procedurally similar to what he did in the Porter case, the murder case for which Defendant Raleigh was serving his life sentence in Oak Park Heights. (*Id.* at 194-95.)

During the conversation, Defendant Raleigh asked about others' culpability, and made certain admissions and incriminating statements about his involvement in the triple murder. (*Id.* at 147, 191.) He also stated that he knew that the investigators had holes in their cases and that he could fill in the gaps.

(*Id.* at 148.)  In addition, he stated that if he could work out a plea, he would be willing to sit down with lawyers and the investigators and he would give a recorded statement as to what happened.  (*Id.*)  Defendant Raleigh asked about the best and worst possible punishments he was facing, and he referenced the fact that people were saying that he could get the death penalty.  (*Id.* at 148, 193.)  Agent Parker responded that he could not discuss the death penalty with him.  (*Id.* at 148.)  Defendant Raleigh inquired as to why this was a federal case, and Agent Parker explained that it was because it was drug related.  (*Id.* at 196.)  At some point during the conversation, Defendant Raleigh stated that he would be willing to plead to three additional life sentences in this case.  (*Id.* at 147.)  Agent Parker told Defendant Raleigh that it was possible that such a plea deal might be a possibility, but that plea negotiations were not something that the investigators would handle, and that was something the lawyers would have to work out.  (*Id.* at 148-49, 197.)  Agent Parker also told Defendant Raleigh that he would be brought to federal court and that he could either have a paid lawyer or a federal defender represent him.  (*Id.* at 197.)  At the end of the interview, Defendant Raleigh indicated that he wanted to go forward to see if a plea could be made, and the officers told Defendant Raleigh that maybe it would be better at that point for any further discussions to happen between lawyers.  (*Id.* at 149, 198.)  Agent Parker then explained to him the process of what would happen when he came to court for his initial appearance and that any further discussions

could take place once he had a lawyer and the prosecutor was present.  (*Id.* at 149-50.)

During the interview, Agent Parker and Sergeant Bergren were in plain clothes and did not have weapons with them.  (*Id.* at 203.)  Defendant Raleigh did not ask for a lawyer and did not ask for the interview to end.  (*Id.* at 149.) Agent Parker testified that he did not threaten Defendant Raleigh to get him to talk, and did not promise him anything.  (*Id.*)  And Defendant Raleigh was not arrested after the interview because he was already in custody.  (*Id.* at 150.) After the interview, Special Agent Parker reported the conversation that he had had with Defendant Raleigh to Attorney Paulsen.  (*Id.* at 180-81.)

Sergeant Bergren also testified about the meetings that he had with Defendant Raleigh and his testimony is consistent with that provided by Agent Parker.  (*See id.* at 237-73.)  In addition, as to the visits made prior to January 25, 2010, Sergeant Bergren testified that the purpose for the visits was to let Defendant Raleigh know that they were still available in case he wanted to talk to them about the triple-murder case.  (*Id.* at 240, 257, 261.)  Regarding the January 25, 2010 visit, Sergeant Bergren did not discuss this visit with Attorney Paulsen before they went, was not authorized to engage in any plea negotiations with Defendant Raleigh, and testified that he did not do so.  (*Id.* at 267, 277.)

## III.   Monitoring and Copying Jail Mail and Jail Telephone Calls

Since March 2007, Defendants Lindsey and Raleigh have been confined

at different prisons or jails at different times for different reasons.  Defendant Lindsey was arrested on March 26, 2007, in connection with the arrest warrant discussed above for fleeing a police officer.  He was thereafter held at the Ramsey County Law Enforcement Center for prosecution by Ramsey County in a different murder case (i.e., the Brooks murder case) until December 14, 2007, when he was transferred to St. Cloud Prison following his sentence in the Brooks case.  On February 15, 2008, Defendant Lindsey was transferred to Oak Park Heights for a continuation of his sentence in the Brooks murder case.  On January 27, 2010, he was transferred to the Sherburne County Jail for two days following his arrest on the triple-murder indictment in this case.  And on January 29, 2010, he returned to Oak Park Heights, where he continues to be confined today.

Defendant Raleigh began serving his sentence in the Porter murder case in St. Cloud on September 10, 2008, where he stayed until September 23, 2009, when he was transferred to Oak Park Heights for security reasons.  On January 26, 2010, he was transferred to the Sherburne County Jail for two days following his arrest on the triple-murder indictment in this case.  And on January 28, 2010, he returned to Oak Park Heights, where he continues to be confined today.

Throughout both Defendant Lindsey and Defendant Raleigh's periods of confinement, and during the investigation of the triple murder at issue here, certain law-enforcement agencies requested and received copies of Defendants'

mail and telephone calls that were sent and received to and from the various prisons where they were incarcerated.  The following testimony relates to the monitoring, recording, and fulfilling of such requests at the various facilities, as well as their various policies regarding the monitoring and recording of prisoner mail and phone calls.

### Testimony from Investigator Donald Rothstein

Donald Rothstein has worked for the Minnesota Department of Corrections for 31 years; he has been a corrections officer, a sergeant, and a lieutenant at the St. Cloud prison, and he has also worked as an investigator and an investigator supervisor for the Office of Special Investigations.  (*Id.* at 57.)  As part of the Office of Special Investigations, he works on internal criminal investigations, gathers intelligence and identifies gang members in the prison system, and works cooperatively with law-enforcement agencies.  (*Id.*) Mr. Rothstein is familiar with all of the Department of Corrections' prisons in the state of Minnesota because he supervises investigators at each one of the prisons.  (*Id.*)

Mr. Rothstein explained that when a prisoner comes into the Department of Corrections, he or she is initially sent to the reception center at the prison in St. Cloud, where they go through an initial orientation and intake process, which for a first-time offender can last about two months.  (*Id.* at 57-58.)  After the orientation process is through, the prisoner then is transferred to one of the

prisons throughout the state.  (*Id.* at 58.)[12]  During the intake process at

St. Cloud, offenders sign off on various forms, allowing for Corrections to gather

data on them, including forms regarding data privacy and notice for monitoring

mail and telephone calls.  (*Id.* at 58.)

At the hearing, Mr. Rothstein identified Hearing Exhibits 7 and 8, which

were signed by Defendants Lindsey and Raleigh respectively.  (*Id.* at 59.)  Each

document notifies the offenders that any of their in-person telephonic or mail

correspondence are subject to monitoring. (*Id.* at 59, 62.)  The documents do not

notify the offender that telephone calls will be recorded, may be used against him

in an internal disciplinary proceeding, or may be used against him in a

prosecution in a court of law.  (*Id.* at 62.)  However, the Minnesota Department of

Corrections records all inmates phone calls, and searches all inmate mail.  (*Id.* at

61.)

Mr. Rothstein testified that at the Minnesota prisons, "[a]ll offender-related

telephone calls are initiated by the offender going out.  There are no[] incoming

calls.  All of those calls are recorded at all of our facilities."  (*Id.* at 60.)  The Office

of Special Investigations monitors calls that are of interest to them related to any

internal prison investigations or for the safety and security of the facility, or for the

purpose of helping law enforcement with criminal investigations.  (*Id.*)  Phone

calls made to an offender's attorney, however, are made on a separate

--------------------------------

12      Here, after Defendants Lindsey and Raleigh left St. Cloud, they both were
                                                        (Footnote Continued on Next Page)

telephone and are not monitored.  (*Id.* at 61.)  At each institution, prior to an inmate making a phone call, the inmate receives a verbal warning message that the telephone call that they are making is recorded or subject to monitoring. (*Id.* at 60, 62.)  Mr. Rothstein testified that he does not know the exact wording of this message, but that, to the best of his knowledge, the message does not inform the offender of what use might be made of any recordings.  (*Id.* at 63.)

In regard to incoming and outgoing mail, mailroom staff searches, but does not read, all incoming and outgoing mail for contraband, cash, narcotics, or other non-allowable items.  (*Id.* at 60.)  The Office of Special Investigations only reads mail after receiving written approval from the warden at the facility.  (*Id.*)  Legal mail, however, is not read.  (*Id.*)  The Office of Special Investigations will seek approval by the warden to read an offender's mail if it suspects that the inmate is engaged in criminal activity or disruptive conduct within the facility, or if law enforcement working on a criminal investigation so requests.  (*Id.* at 63.)  When the Office of Special Investigations makes a request to the warden to read an inmate's mail, it will designate the reason for the request (i.e., for a criminal investigation, "suspicion of criminal activity," "disruptive behavior," "gang activity").  (*Id.*)

Mr. Rothstein testified that in his discussions with the investigators he supervises, those investigators told him that they have not read Defendant

_____

(Footnote Continued from Previous Page)
transferred to Oak Park Heights.  (*Id.* at 78.)

Lindsey's mail, but they have provided it to law enforcement upon request. (*Id.* at 64.) When law enforcement makes such a request, Mr. Rothstein is contacted, and he makes sure that the requesting officials are actually working a criminal case. (*Id.*) Mr. Rothstein then assigns a case number to the request and assigns an investigator to work on the request cooperatively with law enforcement. (*Id.*) For Defendant Lindsey, law enforcement (St. Paul Police Department, Ramsey County, and the FBI), made initial requests shortly after the triple murder in St. Paul, and the requests asked for the Office of Special Investigations to provide copies of Defendant Lindsey's mail to them. (*Id.* at 65.)[13] At one point, the Office of Special Investigations had closed the previous cases open as to Defendant Lindsey, but in November or December of 2009, the FBI requested to reopen the examination of Defendant Lindsey's mail based on a criminal investigation involving a triple homicide, and the Office of Special Investigation again began sending the FBI all correspondence written by Defendant Lindsey or sent to Defendant Lindsey. (*Id.* at 65-66.) The reason for forwarding Defendant Lindsey's mail to the FBI had nothing to do with internal prison discipline or safety. (*Id.* at 66.)

---

[13] At this same time, the Office of Special Investigations received requests from a St. Paul investigator, a Ramsey County investigator, and the FBI, for copies of Defendant Lindsey's telephone calls to be provided. (*Id.* at 67.) Mr. Rothstein contacted Tom Bergren and asked if the different forces could combine their efforts, and thereafter they provided copies of all of the calls to one person. (*Id.*)

As part of their investigation into the triple homicide, law enforcement authorities also requested that Defendant Raleigh's telephone calls be monitored, and the Office of Special Investigation complied with the request.[14] (*Id.* at 72.)  The Department of Corrections intake form that Defendant Raleigh signed when he entered the prison system warned him that telephone calls were subject to recording and monitoring.  (*Id.* at 70.)  Also, there was a warning message to this effect played at the start of telephone calls and a similar message on signage hanging on or by all prison telephones.  (*Id.*)  The prisoners are not notified when requests are made to have their telephone calls recorded or their mail read.  (*Id.* at 74.)

### Testimony from Janet Huber-Loe

Janet Huber-Loe has been a crime and intelligence analyst with the Ramsey County Sheriff's Department, Special Investigations Division, for seven years.  (*Id.* at 80.)  As a crime and intelligence analyst, she assists investigators on cases, and she used to assist other law-enforcement agencies with burning of inmate calls to CDs.  (*Id.*)

Ms. Huber-Loe knew that Defendant Lindsey was held in the Ramsey County Holding Detention Facility from March 2007 through December 2007.  (*Id.* at 81.)  She is somewhat familiar with that facility and has been there personally,

---

[14]     Mr. Rothstein assumed that it was Sergeant Bergren who made the request, but it could also have been FBI Agent Parker.  (*Id.* at 73, 76.)

and she is familiar with the Ramsey County Adult Detention Center policy regarding the use of phones and recording of calls.  (*Id.*)  She has seen, and provided pictures of, the signs that appear next to each phone.  (*Id.*; *see* Gov't Exs. 9, 10, 11.)  The signs say, "All non-privileged phone calls are subject to monitoring and/or recording."  (Tr. at 85; Gov't Ex. 11.)  There are also signs next to the phones that say "How to use the phone" at the top, and at the bottom it says "Calls may be monitored and recorded."  (Tr. at 86; Gov't Ex. 10.)  In addition, when an inmate makes a phone call at the Ramsey County Detention Facility, he is given a recorded warning on the phone call that says that calls are subject to monitoring and/or recording; the inmate must listen to this warning at the start of each and every call.  (Tr. at 96.)

Further, when the inmates are booked in, they sign a property sheet and initial next to a paragraph that acknowledges that their calls are subject to monitoring and recording.  (*Id.* at 81, 86-87.)[15]  Also, there is a video that plays in the booking area and on a particular channel on the jail televisions that, among other things, explains how to use the jail phones.  (*Id.* at 82.)  It says that the inmates are responsible for providing their attorneys' names to the program people and that those calls with attorneys are not recorded, but that all other calls are subject to recording and/or monitoring.  (*Id.*; *see* Gov't Ex. 13.)  In addition, a handbook is located in each pod and is available to the inmates.  (Tr. at 82; *see*

---

[15]     Ms. Huber-Loe testified that she does not have such a signature form for

(Footnote Continued on Next Page)

Gov't Ex. 12.)  There is no instruction given to inmates in the handbook or on the telephones that their monitored or recorded calls may be turned over to a criminal investigator, used against them in a court of law, or used in a federal criminal investigation.  (Tr. at 87.)

The Ramsey County Adult Detention Center monitors certain calls if there is an issue of security with that inmate in the jail, or if a law-enforcement agency has an open investigation and requests the calls of an inmate.  (*Id.* at 88.)  With regard to Defendant Lindsey, Ms. Huber-Loe provided recordings of his calls to the St. Paul Police Department at the request of Sergeant Jane Mead.  (*Id.* at 88-89.)  Ms. Huber-Loe keeps handwritten notes relating to the requests that were made.  (*Id.* at 89; *see also* Lindsey Ex. 6.)  Her notes reflected that the initial request was made over the phone from the St. Paul Police Department on March 29, 2007, and that the St. Paul Police Department wanted the monitor in place because it was investigating a homicide.  (*Id.* at 91-92.)  Ms. Huber-Loe testified that she provided the calls requested without regard to any internal disciplinary or security investigation at the jail.  (*Id.* at 94.)

### Testimony from Investigator Vincent Krenz

Vincent Krenz works at the Minnesota Correctional Facility at Oak Park Heights, and has worked for the Department of Corrections for twenty years.  (*Id.* at 98.)  For the past five years, Mr. Krenz has worked with the Office of

---

(Footnote Continued from Previous Page)
Defendant Lindsey because such forms are purged after two years.  (*Id.* at 87.)

Special Investigations as an investigator of correctional intelligence, and is responsible for monitoring phone calls and mail, working with outside law enforcement on requests, and interviewing offenders.  (*Id.* at 99.)

At Oak Park Heights, all offender calls are recorded except for prearranged legal phone calls.  (*Id.* at 100.)  Inmates are provided with a statement that they sign acknowledging that phones and mails are subject to monitoring, there are signs next to all phones stating that the inmates' calls are recorded, and there is an audio recording played when inmates initiate a phone call that says "These calls may be monitored and recorded."  (*Id.*; *see* Gov't Ex. 15 (showing a sign that says "All calls are subject to monitoring and/or recording); Gov't Ex. 16 (showing a sign that says "Your use of this telephone constitutes consent to the monitor and recording, and you must contact staff for proper procedure for placing an unmonitored attorney phone call").)  Inmates at Oak Park Heights are allowed to talk on phone calls for 15-16 minutes before their phone call is ended, and if they call back to the same number they had just called, they are given the same warning regarding the recording of phone calls.  (Tr. at 103.)  When offenders come into Oak Park Heights Correctional Facility, they are given the mail and phone policy, and they acknowledge that all their phone calls and mail are subject to monitoring; Defendant Lindsey was given this policy and signed the acknowledgment.  (*Id.* at 104; *see* Gov't Ex. 21.)  Even though Defendant Raleigh is also at the same facility, Krentz testified that they did not have this

signed acknowledgment from him in the base file.  (Tr. at 104-05.)

Regarding monitoring inmate mail, all inmate incoming and outgoing mail in all sections of Oak Park Heights is subject to search for contraband, and the mail may be read and photocopied if there are prison-security issues and the warden approves.  (*Id.* at 105-06; 108.)  In addition, the warden may also approve mail monitoring if a law-enforcement agency requests that this be done to assist in a criminal investigation.  (*Id.* at 106.)  On January 8, 2010, Rob Merrill of the FBI requested that Oak Park Heights monitor, read, and provide Defendant Lindsey's mail; Defendant Lindsey's mail and phone calls had been copied numerous times before as well.  (*Id.* at 107-08.)  In response to the request, Oak Park Heights officers photocopied Defendant Lindsey's mail and gave it to the FBI, as they had in response to numerous prior requests.  (*Id.* at 108; 112.)  On January 18, 2010, Rob Merrill also requested, through Mr. Rothstein, that Krenz copy and provide Defendant Raleigh's mail and phone calls.  (*Id.* at 116-17.)  Krenz complied with this request.

Krenz clarified that internal prison-security concerns did not prompt the reading of Lindsey and Raleigh's mail and the monitoring of their phone calls; these actions were taken in response to the requests from outside law-enforcement agencies for assistance in the homicide investigation.  (*Id.* at 117.)  And Krenz is not aware of any warning provided to inmates at Oak Park Heights that their mail or phone calls could be provided to outside law-enforcement

agencies or used in a criminal prosecution against them.  (*Id.* at 111-12.)

**Testimony from Investigator Michael Sieg**

Michael Sieg has been a law enforcement officer for twenty-two years, and

he currently works as an investigator and is a deputy sheriff at the Sherburne

County Sheriff's Office.  (*Id.* at 121.)  As an investigator assigned to the jail, he

investigates any criminal activity within the jail, assists law-enforcement agencies

with their requests, and performs background and crash investigations.  (*Id.*)

Investigator Sieg is familiar with the phone-system policies and procedures at

Sherburne County because he has worked the phone system daily for the past

five years.  (*Id.*)  An inmate handbook is given to every inmate that comes into

the facility that explains the policy regarding phones and recordings.  (*Id.* at 122.)

The policy is that all phone calls are recorded except for attorney-client calls.

(*Id.*)  At the bottom of the phone located in the booking area (and on all other

phones), it says "Calls are subject to monitoring and recording."  (*Id.* at 123-24;

*see* Gov't Ex. 20.)  There is also a verbal warning given on the telephones when

a call is made that says one of two things – "This call is subject to monitoring and

recording," or "These calls are recorded and are subject to monitoring."  (*Id.* at

123.)

Defendant Lindsey was housed in Sherburne County for one (or two)

night(s) in 2010; he did not make any non-lawyer phone calls or receive or send

any correspondence during that stay.  (*Id.* at 124-25)  Investigator Sieg could not

46

recall whether he provided Defendant Lindsey's telephone calls and mail to outside law-enforcement agencies during Defendant Lindsey's prior stay in 2006. (*Id.* at 125.) Investigator Sieg routinely honors any outside law-enforcement agency requests for mail and phone calls, however, the jail usually requires a subpoena. (*Id.* at 126.) The inmates are not informed when he actually provides the calls and letters to the outside law enforcement. (*Id.* at 127.)

The FBI also requested Defendant Raleigh's phone calls and mail correspondence for the two days Defendant Raleigh was at Sherburne County Jail, January 26 - 28, 2010. Investigator Sieg did not think that there was any mail correspondence to or from Defendant Raleigh at that time, but he believed that Defendant Raleigh's phone calls were monitored and the recordings were provided to the FBI. (*Id.* at 129-30.) The jail did not have a security concern for Defendant Raleigh that prompted the monitoring of his phone calls. (*Id.* at 130.)

**ANALYSIS**

**I.      Defendant Lindsey's Motions for Suppression**

Defendant Lindsey moves to suppress any evidence obtained as a result of the following searches and seizures: (1) the March 26, 2007 warrantless entry into Defendant Lindsey's sister's apartment; (2) the March 26, 2007 arrest of Defendant Lindsey at his sister's apartment on a Ramsey County arrest warrant; (3) the March 26, 2007 warrantless search of Defendant Lindsey's sister's apartment; (4) the March 26, 2007 search of Defendant Lindsey's person; (5) the

March 27, 2007 and April 5, 2007 searches of a cellular telephone allegedly seized from Defendant Lindsey's person on March 26, 2007, which were conducted pursuant to warrants issued by Ramsey County District Court Judges Eleanor Ostby and Michael DeCourcy, respectively; (6) interception of jail calls made to and from Defendant Lindsey; and (7) interception of jail mail to and from Defendant Lindsey.  This Court addresses Defendant Lindsey's arguments below.

### A.    March 26, 2007 search and seizures at Defendant Lindsey's sister's apartment

Defendant Lindsey contends that Officers Martin and Peterson violated his Fourth Amendment right to be free from unreasonable searches and seizures. Specifically, Defendant Lindsey argues that the officers entered the Minneapolis Residence without consent or a warrant, and that all evidence resulting from that initial entry and subsequent search—including evidence taken from Defendant Lindsey during Officer Martin's search incident to arrest, Defendant Lindsey's answers to all subsequent questioning, evidence seized from Defendant Lindsey at the police station, and evidence retrieved as a result of the warrants issued after Defendant Lindsey's arrest—is inadmissible fruit of the poisonous tree.  The Government asserts that no violation occurred and that the officers obtained valid consent before entering the Minneapolis Residence.

The Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. amend. IV.  A search occurs when government agents

48

invade a subjective manifestation of privacy that is objectively reasonable. *Kyllo v. United States*, 533 U.S. 27, 33 (2001). A warrantless search is reasonable if the officer obtains knowing and voluntary consent from someone with common authority over the premises. *United States v. Rodriguez*, 414 F.3d 837, 844 (8th Cir. 2005). Consent is free and voluntary if, in light of the totality of the circumstances, it came free of express or implied coercion. *United States v. Escobar*, 389 F.3d 781, 784-85 (8th Cir. 2004). Consent must come from someone with common authority over, or sufficient relationship to, the object of the search. *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003). Whether someone has common authority is a question of fact, determined by the existence of mutual use, joint access, and control of the property in question. *United States v. Almeida-Perez*, 549 F.3d 1162, 1170 (8th Cir. 2008). An adult co-occupant of a residence may provide valid consent to a search. *United States v. Jones*, 193 F.3d 948, 950 (8th Cir. 1999).

Law enforcement officers' reliance on a consenting party's authority need not be correct so long as it is reasonable. *James*, 353 F.3d at 615 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990)). If the facts available to the officer at the time of entry would warrant a reasonable belief that someone with authority over the premises consents, then no Fourth Amendment violation occurs. *Jones*, 193 F.3d at 950. Therefore, "where a person exercises privileges that would only be proper for an occupant of the house, the police may draw the

inference that the person is indeed an occupant unless there are other circumstances that would cause a reasonable man to doubt the validity of that inference." *Almeida-Perez*, 549 F.3d at 1171.

The Government contends that Defendant Lindsey has failed to establish standing to challenge the entry and search of the Minneapolis Residence. To challenge a search for violating the Fourth Amendment, a person must establish standing. *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000). A defendant must prove a sufficiently close connection to the relevant places or objects in order to claim that a search was unconstitutional. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). Both residents and overnight guests have a reasonable expectation of privacy in a living space. *Minnesota v. Olson*, 495 U.S. 91 (1990). Here, the record supports finding that Defendant Lindsey and his girlfriend Candice Jones were overnight guests at the Minneapolis Residence. Because Defendant Lindsey was an overnight guest, he had a reasonable expectation of privacy in the house and standing to challenge the entry and search. *Olson*, 495 U.S. at 96–97 (a person's status as an overnight guess is enough to prove a reasonable expectation of privacy); *see also United States v. Oates*, 173 F.3d 651, 656 (8th Cir. 1999) (status as an overnight guest creates a reasonable expectation of privacy against anyone but the host and those the host allows inside).

Given Defendant Lindsey's standing, the issue before this Court is whether

the officers obtained valid consent before their entry and search of the Minneapolis Residence.  As described above, the Government and Defendant Lindsey presented conflicting evidence in this regard.  The Government's witnesses—Officers Martin and Petersen—testified that a black woman answered the door, and that she consented to their entry and search.  Neither Officer Martin nor Officer Petersen could provide any description of the person who answered the door other than that it was a black woman.  Neither could specifically recall the layout of the residence, whether anyone else was in the apartment when they searched it, or any other specific details about the encounter at the Minneapolis Residence on the morning of March 26, 2007, other than the fact that Officer Martin found Defendant Lindsey standing clothed in the shower, that he appeared anxious, and that he was sweating profusely. Regarding the woman at the door, Officer Martin's testimony reflects that she had only a short interaction with her in which Officer Martin asked for and obtained consent to enter and search the residence to look for Marvin Waldrop.  Officer Petersen, however, testified that she stayed and talked with the woman at the door while Officer Martin entered the apartment, and Officer Petersen re-testified and confirmed that the person at the door was a black female, and that that black female gave the officers consent to enter and search.

The identity of the woman who answered the door is unclear.  The record reflects that the woman could not have been Tyronda Lindsey because her

employment records show that she was at work at that time.  The Government does not contest the accuracy of these records.  The record also reflects, however, that it is possible that the woman who answered the door was Candice Jones.  Defendant Lindsey's own witness, DaJuan Rayford, testified that Ms. Jones, a frequent overnight guest, had spent the previous night at the residence and was present at the time of the search.  This Court finds the testimonies of Officers Martin and Petersen credible—that the woman acted with authority and familiarity at the door such that it was reasonable for the officers to rely on her authority to consent.

Defendant Lindsey asserts that the officers could not reasonably believe that the woman who answered the door had authority to consent to the search of the Minneapolis Residence.  Specifically, Defendant Lindsey relies on *United States v. Hilliard*, 490 F.3d 635 (8th Cir. 2007), to argue that the officers needed facts corroborating their belief that the woman had authority to consent.  In *Hilliard*, the Court found that the consenting woman's behavior and subsequent events—her invitation to follow her into the bedroom, her collection of clothing off the floor to dress herself, her familiarity with the residence—gave them no reason to doubt her authority to consent to their search.  *Id.* at 639.  Defendant argues that because Officers Martin and Petersen had no similar facts supporting the woman's authority to consent to a search of the premises, it was unreasonable for them to believe that she had such authority.

Defendant Lindsey misinterprets Eighth Circuit precedent. The general rule in this circuit is that the police may draw an inference that a person who exercises privileges that would only be proper for an occupant of the house is indeed an occupant unless other circumstances would lead a reasonable person to doubt such a conclusion. *Almeida-Perez*, 549 F.3d at 1171. This is directly in line with *Hilliard*, where officers reasonably relied on a woman's consent at the door. 490 F.3d at 639-40. No facts available to the officers at the time of the consent would have given them reason to doubt the woman's apparent authority. *See id.* Just because subsequent facts corroborated their reasonable belief that the woman had authority to consent to a search, *id.* at 639, it does not make such facts a necessity. *See, e.g.*, *United States v. Weston*, 443 F.3d 661, 668 (8th Cir. 2006) (holding that police could reasonably rely on the appearance that defendant's ex-wife was in charge); *Iron Wing v. United States*, 34 F.3d 662, 665 (8th Cir. 1994) (holding that police reasonably relied on defendant's sister-in-law's apparent authority to consent even though she had no key and had to crawl through a window to enter because her statement that she lived at the house and left the window unlocked was corroborated when she opened the window). Although other circuits use different approaches, *see, e.g., United States v. Cos*, 498 F.3d 1115 (10th Cir. 2007) (requiring police to verify a third party's authority before relying on his consent), *and United States v. Whitfield*, 939 F.2d 1071 (D.C. Cir. 1991) (requiring police to inquire for proof of both mutual use and joint

access to rely on a third party's consent), Eighth Circuit precedent binds this Court's decision. Here, upon knocking, the police encountered an adult female who answered the door. She allowed the officers in without resistance or hesitation.[16] No facts were available to Officers Martin or Petersen that should have alerted them that she might not have authority to consent to a search. It follows that the officers could reasonably rely on the woman's authority to admit them into the residence.

Further, the woman gave her consent voluntarily. In determining whether consent was freely and voluntarily given, courts consider the person's age, general intelligence and education, level of intoxication, whether the person was informed of the right to withhold consent, and experience with prior police interactions. *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990). Courts also consider the environment in which an officer obtained consent by determining whether (1) the person was detained and questioned for a long or short time, (2) was threatened, physically intimidated, or punished by the police, (3) relied upon promises or misrepresentations made by the police, (4) was in

---

[16]    Defendant Lindsey does not contend that the search extended beyond the scope of the consent the officers received. Nevertheless, based on the record before it, this Court notes the officers did not extend their search beyond the scope that "the typical reasonable person [would] have understood by the exchange between the officer and the [person at the door]." *United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991)). The consent given was for the officers to enter to look for Martin Waldrop; the officers did not extend their search to places other than those where a person could be.

custody or under arrest, (5) was in a public or secluded place, or (6) objected to the search or stood silently while the search occurred. *Id.* No single factor is dispositive, and whether consent was voluntary is determined under the totality of the circumstances. *Escobar*, 389 F.3d at 785.

Here, the officers asked the woman for consent to enter the home to look for Marvin Waldrop. The woman did not object to the search and allowed Officer Martin to enter the home while Officer Petersen stayed at the door with her. Officer Petersen described the woman as an adult with a "fine" and "pleasant" demeanor. Although the officers did not inform her of her right to refuse consent, they did not detain her for any period, and they did not brandish their weapons at her, threaten or physically intimidate her, or make any misrepresentations to her. *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973) (". . . while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."). The officers asked for consent at the doorway of the residence, a public place for Fourth Amendment purposes. *See United States v. Santana*, 427 U.S. 38, 42 (1976) (holding that defendant was in a public place while standing in the doorway of her house). Under the totality of the circumstances, this Court finds that the woman's consent was voluntary.

Defendant Lindsey's witness DaJuan Rayford offered testimony that directly contradicts the officers' testimony that a black female answered the door

when the officers knocked.  Based on a careful review of the testimony from the witnesses, including the opportunity to observe their demeanor and to judge their credibility, this Court concludes that the two police officers are telling the truth and believes their version of the events—a black female answered the door and gave them permission to enter to look for Marvin Waldrop.  Even if this Court found Mr. Rayford's testimony credible, however, it would still find that Officers Martin and Petersen had a valid consent to search.  Mr. Rayford testified that he answered the door, that the officers told him that they were looking for Marvin Waldrop, and that he responded that Marvin did not live there.  According to Mr. Rayford, one of the officers said that they had a warrant and wanted to look for Marvin inside.  And at that point, Mr. Rayford said nothing and stepped back. The officers entered the residence.  At no time did Mr. Rayford object to the officers' search.

Consent to search does not have to be oral, and can be implied from gestures and other conduct.  *See, e.g.*, *United States v. Mendoza*, 250 F.3d 626, 627 (8th Cir. 2001) (stating that the suspect consented to an officer touching his midsection by raising his arms in response to a request to do so).  According to Mr. Rayford, when the officers came to the Minneapolis Residence and told him that they had a warrant for Marvin, he "just stepped back" from the doorway without saying anything.  Mr. Rayford was on the lease application for and lived

at the Minneapolis Residence.[17]  Therefore, Mr. Rayford had actual authority to consent to a search.  *See Jones*, 193 F.3d at 950.  An officer could have reasonably interpreted Mr. Rayford's step back after the officer requested to search as consent to enter and search the residence.

Mr. Rayford's consent would also have been voluntary.  *Chaidez*, 906 F.2d at 380.  The officers did not detain Mr. Rayford in any way.  They did not brandish their weapons at him, threaten or physically intimidate him, or misrepresent any facts to him.  Mr. Rayford is an adult of normal intelligence who has had previous interactions with police.  He was not in custody, he and the officers were in a public place at the time of their interaction, and he stood silently by while the search occurred.  Viewing the totality of the circumstances, even if this Court were to accept Mr. Rayford's version of the events that took place at the door, it would still conclude that there was voluntary consent to enter and search the Minneapolis Residence.

Based on the foregoing, Defendant Lindsey's argument that any evidence taken from the search pursuant to his arrest and any subsequent statement he made is inadmissible fruit of the officers' unconstitutional search fails.  Because Officers Martin and Petersen received a valid consent to search the apartment, they did not violate Defendant Lindsey's Fourth Amendment rights.  The Court

---

[17]    The Government contests whether Mr. Rayford was on the lease and lived at the Minneapolis Residence.  The Government has not, however, contested the fact that Mr. Rayford at a minimum was a frequent overnight guest.

recommends that evidence resulting from the search of the Minneapolis residence, including evidence seized from Defendant Lindsey's person pursuant to his arrest and any subsequent statements he made to police, should not be suppressed.

### B.    Defendant Lindsey's statements to Sergeant Bergren

Defendant Lindsey moves to suppress any statements he allegedly made, together with any derivative evidence, including the custodial statements that Defendant Lindsey gave pursuant to law-enforcement interrogation, on or about March 26, 2007.  Defendant Lindsey contends that the statements should be suppressed because (1) his arrest was unlawful because it was made on the pretext that there were valid warrants for his arrest, and therefore any statements made on the day of his arrest are fruit of the unlawful arrest; (2) any statement given to Officer Bergren on the same day must be suppressed because no *Miranda* warnings were given prior to certain statements being made; and (3) statements made to Officer Bergren after Defendant Lindsey invoked his right to counsel are inadmissible for any purpose because they were involuntary products of misrepresentations by Officer Bergren and because the officers did not bring Lindsey before a judicial officer without unnecessary delay.

The Government contends that (1) the arrest was not made on pretext because the warrant at issue was active as of March 26, 2007; (2) Defendant Lindsey's motion with respect to any pre-*Miranda* statement given to Officer

Bergren in regard to his cell-phone number is moot because the Government represents that it does not intend to use Defendant Lindsey's response in its case-in-chief; and (3) Defendant Lindsey gave the videotaped statement at the police station after being read and waiving his *Miranda* rights and after only a brief delay (i.e., only approximately an hour and fifteen minutes after his arrest), and Defendant Lindsey's statements given after invoking his right to counsel, while inadmissible for its case-in-chief, are still admissible as impeachment and rebuttal evidence because the statements were voluntary. This Court addresses each of these arguments below.

### (i)     Whether the statements were poisoned fruit from an unlawful search or arrest

Defendant Lindsey argues that any statements he made to Officer Bergren are inadmissible as the direct results of a constitutional violation under the fruit of the poisonous tree doctrine. *See Wong Sun v. United States*, 371 U.S. 471 (1963). This argument fails for two reasons. First, as explained above, no unconstitutional search occurred.

Second, no unconstitutional arrest occurred either. Defendant Lindsey was arrested at the Minneapolis Residence on March 26, 2007, because there was an outstanding warrant issued by Ramsey County District Court for his arrest for fleeing from police officers. This warrant was issued on March 8, 2007, as a bench warrant by Ramsey County District Judge Flynn. Defendant Lindsey points out that he was actually in custody from March 9 to March 11, 2007, and

59

thus, he argues, there could not have been a valid, outstanding arrest warrant on March 26, 2007, because the March 8, 2007 warrant was satisfied by March 11, 2007. But there is no evidence in the record showing that the March 8, 2007 arrest warrant was in fact satisfied during Defendant Lindsey's March 9 - 11, 2007 stay in custody. The Ramsey County Sheriff certification produced by Defendant Lindsey showing that Defendant Lindsey was in the Ramsey County Adult Detention Center from March 9 - 11, 2007, does not indicate that he was, in fact, there after being picked up on the March 8, 2007 warrant. Nor does the certification show that the March 8, 2007 warrant had been satisfied. Defendant Lindsey could have been brought in (or asked to come in) on a completely separate matter. For example, Ramsey County District Judge Rosas had issued a search warrant for a DNA swab from Defendant Lindsey on March 9, 2007, in connection with an investigation of Defendant Lindsey's commission of a firearms offense, and the Receipt, Inventory and Return Form indicates that such DNA swab was taken from Defendant Lindsey's mouth on March 11, 2007. (Lindsey Ex. 3.) Therefore, Defendant Lindsey could have been in custody in relation to the investigation for which the DNA swab related, and not in custody in relation to the fleeing-the-police charge. Furthermore, the Government produced documentation that the March 8, 2007 warrant for Defendant Lindsey was not reduced to writing, signed, and sent to the Sheriff's office until March 15, 2007. (Gov't Ex. 26; Lindsey Ex. 2.) This Court sees no reason to doubt the accuracy

of the Government's proof and finds that a valid arrest warrant for Defendant Lindsey existed on March 26, 2007.  And even if there was some sort of administrative error in allowing the bench warrant to be signed and sent to the Sheriff's office after Defendant Lindsey's stay at the Ramsey County Adult Detention Center from March 9 - 11, 2007, the arrest is still valid because there is no evidence that the officers did not reasonably believe there was an outstanding warrant for Defendant Lindsey's arrest.  *See Herring v. United States*, 129 S. Ct. 695, 703 (2009) (holding that the exclusionary rule did not apply when an arrest was made based on a police recordkeeping error and the officers acted in objectively reasonably reliance).  Therefore, this Court recommends that Defendant Lindsey's motion to suppress on the basis of an unlawful arrest be denied.

### (ii)   Whether the statements to Sergeant Bergren are inadmissible because of unnecessary delay

Defendant Lindsey argues that his statements to Officer Bergren are inadmissible because the police, by taking Defendant Lindsey to St. Paul for questioning before presenting him to a judge, failed to timely present him to a magistrate as required by Federal Rule of Criminal Procedure 5(a).  The Government contends that: (1) Minnesota rather than federal law applies; and (2) because Defendant Lindsey was in front of a magistrate within Minnesota's 36-hour requirement and his statements to Officer Bergren were voluntary, the statements are not inadmissible on account of any delay.  This Court concludes

that under either federal or Minnesota law, Defendant Lindsey's challenge fails.

Under Minnesota law, the officers had a requirement to present Defendant Lindsey before a judge "without unnecessary delay . . . not more than 36 hours after the arrest[.]" Minn. R. Crim. P. 4.02, subd. 5(1). Minnesota courts have said that it is possible for a defendant to show that police violated this rule even if they held defendant for less than 36 hours but nevertheless unnecessarily delayed his arraignment. *E.g.*, *State v. Bradley*, 264 N.W.2d 387, 389 (Minn. 1978). This is because rules requiring prompt arraignment of arrested individuals aim to avoid the "coercive nature of custodial surroundings by preventing secret interrogation and the resultant pressure to confess." *State v. Wiberg*, 296 N.W.2d 388, 392 (Minn. 1980). Whether an unnecessary delay demands suppression of evidence is a case-by-case determination. *Id.* at 393. In Minnesota, courts apply four inexhaustive factors when determining whether a delay in presentment requires suppression: (1) the reliability of the evidence; (2) whether the delay was intentional; (3) whether the delay compounded the effects of other police misconduct; and (4) the length of the delay. *Id.*; *see also State v. Waddell*, 655 N.W.2d 803, 813 (Minn. 2003) (citing same factors). Using these factors, a violation of the 36-hour rule might not demand the exclusion of an otherwise reliable and voluntary confession. *See, e.g., Waddell*, 655 N.W.2d 803 (applying the *Wiberg* factors and upholding the admission of a confession made 86 hours after arrest and before arraignment).

Officers Martin and Petersen arrested Defendant Lindsey around 10:30 a.m. on March 26, 2007, and immediately transported him to the St. Paul Police Headquarters. The police intentionally took Defendant Lindsey to St. Paul for Officer Bergren to question him before presenting him to a judicial officer. Upon arrival, Officer Bergren interrogated Defendant Lindsey from 11:44 a.m. to 11:52 a.m. Defendant Lindsey knowingly and voluntarily waived his Miranda rights before making certain statements, suggesting that those statements are reliable, and the police complied with the recording requirement for custodial interrogations, *see State v. Scales*, 518 N.W.2d 587 (Minn. 1994), reducing the risk of secret coercion. Defendant Lindsey then appeared before a judicial officer on the morning of March 27, 2007, within Minnesota's 36-hour requirement. Taking all these considerations into account, including the importance of prompt appearance, the brief delay here, and the lack of a coerced confession—the chief concern of the prompt appearance rule—this Court concludes that under Minnesota law, Defendant Lindsey's statements to Officer Bergren are not inadmissible solely because of delay.

This Court comes to the same conclusion under federal law, but for different reasons. Federal Rule of Criminal Procedure 5(a) requires a person making an arrest to present the defendant before a state or local judicial officer "without unnecessary delay." Fed. R. Crim. P. 5(a). However, a "duty to present a person to a federal magistrate does not arise until the person has been

arrested for a *federal* offense." *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994) (emphasis in original). When Officer Bergren questioned Defendant Lindsey, Defendant Lindsey was under arrest pursuant to a state warrant for fleeing an officer. Therefore, the police had no obligation under federal law to present Lindsey before a federal magistrate. *See United States v. Pugh*, 25 F.3d 669, 674 (8th Cir. 1994) (finding no delay in presenting defendant to a federal judge because he was not under arrest for a federal crime). Absent any obligation to present Defendant Lindsey before a federal magistrate, the police cannot have created an unnecessary delay in presenting him under Rule 5(a).

Furthermore, even if the officers had an obligation under federal law to present Defendant Lindsey to a magistrate, "a delay alone will not render a confession inadmissible." *United States v. Senogles*, 570 F. Supp. 2d 1134, 1160 (D. Minn. 2008) (quoting *United States v. Bear Killer*, 534 F.2d 1253, 1256-57 (8th Cir. 1976)). According to 18 U.S.C. § 3501(c), custodial confessions are not inadmissible solely because of delay if (1) the statements were made within six hours of the suspect's arrest; (2) the weight of the statements are left to the jury; and (3) the statements were voluntary. *See Corley v. United States*, 129 S.Ct. 1558, 1572 (2009) (holding that if a suspect makes a voluntary confession within six hours of his arrest, it is admissible subject to the other Rules of Evidence). In the Eighth Circuit, "[v]oluntariness, rather than delay, is the key factor." *United States v. Van Lufkins*, 676 F.2d 1189, 1193 (8th Cir. 1982). As

stated above, Officers Martin and Petersen arrested Defendant Lindsey around 10:30 a.m., and Officer Bergren interrogated him from 11:44 a.m. to 11:52 a.m. the same day. This is well within the six-hour window. And Defendant Lindsey knowingly and voluntarily waived his *Miranda* rights before making certain statements, suggesting that the statements are reliable.[18] Accordingly, this Court concludes that even under federal law, Defendant Lindsey's statements are not inadmissible solely because of delay.

### (iii) Whether the statements in response to Sergeant Bergren's cell-phone questions should be suppressed[19]

When the police brought Defendant Lindsey to St. Paul Police Headquarters on March 26, 2007, they took him to an interview room. There, Officer Bergren began the conversation by obtaining routine booking information from Defendant Lindsey, such as his name and date of birth. Officer Bergren then asked a series of questions relating to whether Defendant Lindsey had a cell phone. Defendant Lindsey seeks suppression of the cell-phone-related questions as exceeding the *Miranda* exception for booking questions. This Court agrees that two of the questions that Officer Bergren asked before providing

---

[18] The Court addresses the statements made before *Miranda* and the statements made after Defendant invoked his right to counsel below.

[19] Even though the Government has stated that it "does not intend to use Defendant Lindsey's response about the cellular telephone in its case in chief," (Gov't Resp. to Lindsey 7), this Court addresses whether Defendant Lindsey's responses to Officer Bergren's pre-*Miranda*-warning questions should be suppressed in an effort to be thorough and address all challenges.

Defendant Lindsey *Miranda* warnings did exceed the booking exception, and therefore Defendant Lindsey's responses to those questions should be suppressed.

The Fifth Amendment protects individuals not only from formal compulsion to testify in a criminal trial, but also from informal compulsion law-enforcement officers exert during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 461 (1966). *Miranda* warnings must precede any custodial interrogation. *Id.* at 460-61. *Miranda* requirements arise only when a defendant is both in custody and interrogated. *United States v. Head*, 407 F.3d 925, 928 (8th Cir. 2005). Because Defendant Lindsey was in custody, the issue is whether any statements he made before receiving his *Miranda* warnings resulted from interrogation. *See United States v. Broines*, 390 F.3d 610, 612 (8th Cir. 2004). Interrogation is any word or action "on the part of the police (other than those normally attendant to arrest and custody) that the police should know [is] reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Voluntary statements not responding to interrogation are admissible with or without *Miranda* warnings. *Head*, 407 F.3d at 928.

Not every police question constitutes interrogation requiring a *Miranda* warning. *United States v. McLaughlin*, 777 F.2d 388, 391-92 (1985); *see also United States v. Sims*, 719 F.2d 375, 378-79 (11th Cir. 1983) (holding that a

government agent's asking a detainee's address and telephone number for non-interrogative identification purposes does not require a *Miranda* warning). Information necessary for basic identification purposes provided in a post-arrest interview is not the product of interrogation, even if the information is incriminating, unless the government agent should reasonably be aware that the information he seeks is directly relevant to the substantive offense. *McLaughlin*, 777 F.2d at 391-92. If the booking interview questions go beyond routine processing questions, a suspect has a right to receive *Miranda* warnings. *Cf. United States v. Reyes*, 908 F.2d 281, 287-88 (8th Cir. 1990) ("We further note that [defendant] did not have a right to be read the *Miranda* warnings only to the extent [the officer] asked him routine processing-type questions such as [his] name, address, or related matters.").

Officer Bergren began his interview of Defendant Lindsey with basic identification questions—name, age, and date of birth—to complete the police intake form. He also asked Lindsey for his cell phone number. Defendant Lindsey responded, "I ain't got no cell phone." (Gov't Ex. 6.) These questions and their responses fall within the *Miranda* exception for basic identification information. Officer Bergren did not design them to elicit incriminatory responses or admissions. Even if the questions elicited an incriminating response, they sought only biographical data necessary to complete booking or pretrial services. *See United States v. Horton*, 873 F.2d 180, 181 n.2 (8th Cir. 1989) (concluding

that admitting defendant's false response to booking question into evidence did not violate his *Miranda* rights).

However, Officer Bergren then followed Defendant Lindsey's answer that he did not have a cell phone with two more questions:  (1) "What cell phone you using right now?"; and (2) "You got a girl?"  (Gov't Ex. 6.)  These questions are not basic identification questions.  Because Defendant Lindsey had already told Officer Bergren that he did not have a phone, the following question about what cell phone Defendant Lindsey was using was investigatory in nature.  And whether Defendant Lindsey "[has] a girl" does not reasonably relate to routine "questions to secure biographical data necessary to complete booking." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).  Officer Bergren should have expected these questions to elicit incriminating responses, *see McLaughlin*, 777 F.2d at 392, especially considering, for example, that he knew that Officer Martin seized a cell phone when she arrested Defendant Lindsey.  Because Defendant Lindsey had not received his *Miranda* warnings before these questions, this Court concludes that Defendant Lindsey's responses to these two questions are inadmissible in the Government's case-in-chief.

### (iv) Whether Defendant Lindsey's statements made after invoking his right to counsel are inadmissible

The Government has represented that it does not intend to use any statements that Defendant Lindsey made to Officer Bergren after requesting to speak to an attorney in its case-in-chief.  Defendant Lindsey asserts that these

statements are inadmissible for any purpose.  In addition, Defendant Lindsey

asserts that any such statements were involuntary because they were induced by

Officer Bergren's misrepresentations and are therefore inadmissible.  In

response, the Government concedes that these statements are inadmissible in

its case-in-chief, but argues that they are admissible as impeachment and

rebuttal evidence.

Statements that are inadmissible in a prosecution's case-in-chief for fear of

violating a defendant's Fifth Amendment rights can be admissible for

impeachment purposes.  *Harris v. New York*, 401 U.S. 222 (1971); *see also*

*Krimmel v. Hopkins*, 44 F.3d 704, 709 (8th Cir. 1995) (holding that the

Government can use statements that are inadmissible in its case-in-chief to

impeach a defendant's credibility).  This is because suppressing illegally obtained

statements for the Government's case-in-chief fulfills the exclusionary rule's

purpose.  *Harris*, 401 U.S. at 224, 225.  If a defendant takes the stand and places

his credibility at issue, the Government may use his statements—even

statements made after invoking his right to counsel—for impeachment purposes

so long as he made them voluntarily.  *Id.*  The admissibility of rebuttal evidence,

however, is a matter left to the sound discretion of the trial judge. *United States v.*

*Armstrong*, 462 F.2d 408, 411 (8th Cir. 1972).  Accordingly, this Court agrees

that any statements Defendant Lindsey made after invoking his right to counsel

are inadmissible in the Government's case-in-chief.  Whether any such

statements are admissible as impeachment or rebuttal evidence is a determination best left for the trial judge, if the need for such a determination arises.

### C. Evidence seized pursuant to the Ramsey County search warrant and pen register

#### (i) March 27, 2007 search warrant

After Officer Martin seized a cellular telephone from Defendant Lindsey's person on March 26, 2007, St. Paul Police Sergeant Jane Laurence obtained a search warrant on March 27, 2007, signed by Ramsey County District Judge Elena Ostby, for the data contained in the cellular telephone. Defendant Lindsey challenges this warrant as the fruit of the poisonous tree based on the unlawful entry into the Minneapolis Residence. Because this Court concludes that the entry was not unlawful, this argument fails.

Alternatively, Defendant Lindsey contends that the warrant lacks probable cause because the only information in the supporting affidavit connecting Defendant Lindsey with the offense was information from an uncorroborated anonymous caller, who reported that Defendant Lindsey was responsible for organizing and carrying out the home invasion where the triple murder occurred. The Government contends that (1) Defendant lacks standing to challenge the validity of the warrant; (2) under 18 U.S.C. § 2703(d), probable cause is not required for records to be produced by the service provider; (3) to the extent that probable cause was required to search the contents of the cell phone, probable

70

cause existed; and (4) even if probable cause was lacking, suppression would not be warranted because the *Leon* good-faith exception applies.

### a.    Standing

Fourth Amendment rights are personal and cannot be asserted vicariously. *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000).  A defendant moving to suppress evidence must show a legitimate expectation of privacy in the thing searched.  *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).  A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched . . . has no standing to claim that they were searched or seized illegally."  *Id.*  A defendant seeking suppression has the burden of establishing a reasonable expectation of privacy, which the court assesses by evaluating such factors as ownership, possession, and use of and ability to control the place searched or the item seized.  *Pierson*, 219 F.3d at 806.  If the Court finds facts supporting both sides such that it is not "well positioned" to determine if a party has a reasonable expectation of privacy, it can examine instead the validity of the search.  *See United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003).

Here, Defendant Lindsey has failed to produce any evidence showing that he owned, possessed, used, or controlled the cell phone in issue.  Instead, he assumes standing and argues that the warrant lacks probable cause.  The only evidence in the record even approaching the issue whether Defendant Lindsey

has standing to challenge the search of the cell phone is the testimony from Officer Martin that she seized a cell phone from Defendant Lindsey's pants pocket when she pat-searched him on March 26, 2007, Defendant Lindsey's statement to Officer Bergren on that same day that he did not own a cell phone, and Defendant Lindsey's statement, which is now excluded from trial, that the seized cell phone was his sister's. Therefore, there is no evidence that supports that Defendant Lindsey owned, possessed, or controlled the cell phone for any length of time other than immediately before the police seized it. *See United States v. Payne*, 119 F.3d 637, 642 (8th Cir. 1997) (concluding that the temporary possession of a suitcase, by itself, was not sufficient to establish a legitimate expectation of privacy in its contents). Because Defendant Lindsey has not met "the burden showing a legitimate expectation of privacy" in the cell phone in question, *Pierson*, 219 F.3d at 806, he lacks the requisite standing to challenge the search of that cell phone, and his motion to suppress the evidence that flowed from that search should be denied.

### b.    Probable cause

Nonetheless, even if Defendant Lindsey did have standing, this Court concludes that the search of the cell phone was valid. On March 27, 2007, Ramsey County District Judge Eleanor Ostby issued a warrant authorizing the search of a cellular telephone, with a specified assigned electronic serial number, that had been obtained from Defendant Lindsey when he was arrested on March

26, 2007.  (Gov't Ex. 1.)  Judge Ostby issued the warrant on the basis of

probable cause contained in the Application for Search Warrant and Supporting

Affidavit of Sergeant Jane Laurence, including information received from two

witnesses of the triple murder, an anonymous tip, and specified information from

Minneapolis and St. Paul Police Officers' investigations.  (*Id.*)  The search

warrant identified the objects of the warrant as:

> All data contained in device.
>
> Subscriber information, activation/deactivation dates, phone number used with this device, features, means and source of payment (including credit card or bank account numbers), an electronic version of complete call detail records or telephone toll information, and the location of cell towers utilized, for the time period of 2-1-07 through 3-27-07.  Additionally, a key to interpret cell tower information is to be included.

(*Id.*)  The warrant was thereafter executed and certain evidence was retrieved

from the service provider associated with the cell phone.

Defendant Lindsey asserts that the anonymous tip provided to law

enforcement was without independent corroborative evidence, and not sufficient

alone to support a finding of probable cause for the warrant.  Searches

conducted pursuant to a warrant are reviewed to determine whether the

information in the warrant application and supporting affidavit provided probable

cause for the search.  *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  "Probable

cause exists when, given the totality of the circumstances, a reasonable person

could believe there is a fair probability that contraband or evidence of a crime

would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 236). When determining whether probable cause exists, a court does not independently evaluate each piece of information, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir. 2004). Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

In reviewing the decision of the issuing court, this Court must ensure that the court "'had a substantial basis for . . . conclud[ing] that probable cause exists.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238-39). Since reasonable minds may differ on whether a particular search warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

Defendant argues that law enforcement relied on a statement from an anonymous tipster who stated that Defendant Lindsey was responsible for organizing and carrying out the home invasion at the location where the triple

murder occurred, and that "[t]here is no corroboration of this in the affidavit." (Doc. No. 151, Def. Lindsey's Mem. 28.)  This Court disagrees.  Although an anonymous tip is "insufficient in itself to support a finding of probable cause[,]" *United States v. Wells*, 223, F.3d 835, 839 (8th Cir. 2000), "[i]nformation may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence."  *United States v. Morales*, 283 F.3d 952, 953 (8th Cir. 2001) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)).  In determining whether the informant's tip has been corroborated, even innocent activity can provide sufficient support.  *United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) ("[C]orroboration of minor, innocent details may support finding of probable cause.").  And not every detail must be corroborated. *See United States v. Gladney*, 48 F.3d 309, 313 (8th Cir. 1995) ("When an informant's information is at least partially corroborated . . . attacks upon credibility and reliability are not crucial to the finding of probable cause.") (quotations omitted).  Moreover, if separate witnesses provide consistent information this can establish reliability to support a finding of probable cause. *See United States v. Fulgham*, 143 F.3d 399, 401 (8th Cir. 1998) (stating that "the two informants' tips were reciprocally corroborative, rendering their information enough to support a finding of probable cause").

Upon reviewing the March 27, 2007 Application for Search Warrant and

Supporting Affidavit in its entirety, this Court finds that there was independent, corroborating evidence to support the anonymous tipster's statement that Defendant Lindsey was "responsible for organizing and carrying out the home invasion robbery and killings at [the address where the triple murder occurred]." (Gov't Ex. 1.)  Although there was no further information in the affidavit about the anonymous tipster, the affidavit set forth corroborating information about Defendant Lindsey's possible involvement in the triple homicide from two witnesses.  *See Fulgham*, 143 F.3d at 401 (indicating that if separate witnesses provide consistent information this can establish reliability to support a finding of probable cause).  One piece of information came from witnesses who reported that "[t]he intruder with the knife stabbed SAUNDERS several times and struggled with him while repeatedly demanding money." (Gov't Ex. 1.)  One witnesses also "saw the 4-5 black males flee [from the triple murder] in a dark SUV." (*Id.*)  When Defendant Lindsey was found at the Minneapolis Residence three days after the murders, he was found hiding in a closet "exhibit[ing] signs of great anxiety," and he had a "fresh break to his wrist" and told the police that "his temporary splint was in a blue SUV." (*Id.*)  The wrist break was consistent with the witness's report of a struggle, and the affidavit stated that the police found a blue SUV at the Minneapolis Residence, which was consistent with the witness statement that the intruders fled in a dark SUV.  Other corroborative information in the affidavit included the fact that there was mud on the blue SUV, and the

yard and parking areas around the residence where the homicides occurred were muddy on the day of the incident. And another piece of corroborative information in the affidavit was the fact that Defendant Lindsey had a history of violent criminal activity.

As set forth above, this Court's role is simply to determine whether the issuing court had a substantial basis for making the "practical, common-sense decision" it did about whether there was a "fair probability" that officers would discover evidence of a crime. *See Gates*, 462 U.S. at 238; *Oropesa*, 316 F.3d at 766. Although each piece of information stated in the affidavit may not provide sufficient probable cause for the warrant to issue, and although the accumulated facts here present a close call for probable cause analysis, taken together and given the totality of the circumstances, this Court concludes that a reasonable person could believe there was a fair probability that evidence of a crime would be found in the information sought pursuant to this search warrant. Accordingly, this Court concludes that the March 27, 2007 search warrant was based on sufficient probable cause as stated in Sergeant Laurence's Application for Search Warrant and Supporting Affidavit and as determined by Judge Ostby, and the evidence seized pursuant to the warrant was not obtained in violation of Defendant Lindsey's constitutional rights. The warrant properly and sufficiently identified the subject cellular telephone and the information that was to be seized.

### c.    Good-faith exception

Even if probable cause did not exist, there was a facially valid warrant and the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered.  "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable."  *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008).  "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization."  *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted).  "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge."  *Id.* at 431 (alteration in original) (quotations omitted).  Here, this Court concludes that the good-faith exception would apply.  There is no evidence to suggest that the officers' reliance on the warrants was not in good faith, nor is there evidence that the officers' reliance was not reasonable.  For these reasons, this Court concludes that the evidence seized as a result of the execution of the search warrant need not be suppressed.

### (ii)     April 5, 2007 pen register

On April 5, 2007, Sergeant Lawrence obtained an order signed by Ramsey County District Judge Michael Decourcy authorizing the use of a pen register and trap device on the same cell telephone that had been seized from Defendant Lindsey on March 26, 2007.  The only challenge that Defendant Lindsey asserts as to this pen register order is that it should be suppressed as fruit of the poisonous tree based on the unlawful entry into the Minneapolis Residence. Because this Court concludes, as explained above, that the entry was not unlawful, this argument fails.

## III.     Defendant Raleigh's Motions for Suppression

Defendant Raleigh moves to suppress the custodial statement that he made to law enforcement on January 25, 2010, asserting several arguments, which are discussed below.  The Government opposes the motion.

### A.     Unnecessary Delay

Defendant Raleigh alleges that the statements he made during the January 25, 2010 interrogation are inadmissible because he was not brought before a Magistrate Judge for an initial appearance without "unnecessary delay." Defendant specifically alleges the Government violated Rule 5(a)(1)(A), Rule 9(a), and Rule 9(c)(1)(B) of the Federal Rules of Criminal Procedure because he was not brought before a Magistrate Judge for an initial appearance until five days after the Indictment returned.  The Government contends that Defendant

Raleigh misinterprets Rule 5, and that Rule 5 would not have been implicated in this case until Defendant Raleigh was brought into federal custody.

### (i)  Rule 5(a)

Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure states, "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."  The Supreme Court has adopted the *McNabb-Mallory* rule that "generally render[s] inadmissible confessions made during periods of detention that violat[e] the prompt presentment requirement of Rule 5(a)."  *Corley v. United States*, 129 S. Ct. 1558, 1563 (2009) (quoting *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354 (1994)).  In analyzing alleged violations of the prompt presentment requirement of Rule 5(a) the Supreme Court has held the following:

> [T]here can be no delay in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place.  Plainly, a duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense.

*Alvarez-Sanchez*, 511 U.S. at 358 (internal quotations omitted).

In this case, Defendant Raleigh was transferred from state custody to federal custody on January 26, 2010, by a Writ of Habeas Corpus Ad Prosequendum.  Defendant Raleigh was in state custody, serving a life sentence for an unrelated murder conviction, prior to the return of the indictment and

remained in state custody until he was transferred to federal custody on January 26, 2010.  The statements that were made by Defendant during the January 25, 2010 interrogation occurred while Defendant was in state custody and before he had been arrested for a federal offense.  Therefore, because Defendant had not been arrested for a federal offense at the time of the January 25, 2010 interrogation, any obligation to promptly present Defendant to a federal magistrate had not been triggered and thus there could be no unnecessary delay in violation of Rule 5(a)(1)(A).  The plain language of Rule 5 refers to a delay between the time of arrest and the time that the defendant is brought before a federal magistrate, not a delay between the return of indictment and the time of arrest.

### (ii)    Rule 9

Defendant Raleigh further argues that Federal Rules of Criminal Procedure 9(a) and 9(c)(1)(B) require the statements made by him during the January 25, 2010 interrogation be suppressed.  Defendant specifically asserts a Rule 9(a) violation because a warrant did not issue, and a Rule 9(c)(1)(B) violation because Rule 5(a)(1) was not followed.  Rule 9(a) states that a "court must issue a warrant – or at the government's request, a summons – for each defendant named in an indictment[.]"  Rule 9(c)(1)(B) states that "[t]he officer executing the warrant must proceed in accordance with Rule 5(a)(1)."  Defendant argues that Rule 9 mandates that "a warrant 'must' issue when an indictment is returned."

(Doc. No. 169, Def. Raleigh's Reply to Post-Hr'g Mem. of the United States ("Raleigh's Reply) 2.)

This Court finds that Defendant Raleigh misreads Rule 9 and that there is no violation of Rule 9(a) based on the plain language of that Rule. The Rule does not state that the Government must obtain a signed warrant or summons within a certain period of time after an indictment has been returned. Instead, the Rule only provides that when a warrant or summons is brought to the Court, the Court must then issue the warrant or summons. In other words, once an indictment has been returned, the court does not have discretion to issue the warrant or summons; – the court must then sign off on a warrant or summons presented to the Court regarding the defendant who has been indicted. Rule 9(a) says nothing about the timing of any such presentation of the arrest warrant or summons to the magistrate judge. Therefore, Rule 9(a) was not implicated at all in this case where no warrant or summons was utilized, presumably because Defendant Raleigh was in custody at Oak Park Heights and thus no arrest warrant or summons was viable. Here, the Government simply sought and obtained a Writ of Habeas Corpus Ad Prosequendum[20] to require the state to turn over its prisoner for his initial appearance in federal court.

---

[20] This Court notes that the magistrate judge signed the Writ upon its presentation to the Court, and therefore, even though not implicated, the spirit of Rule 9(a) was adhered to.

### (iii)    Collusion exception

As referenced in the Rule 5(a) discussion above, courts have held that the rights set forth in Rule 5(a) attach only after the defendant is arrested for a federal offense.  Rule 5(a) rights, however, may attach prior to federal arrest if collusion has been involved.  *See Alvarez-Sanchez* 511 U.S. at 359  (stating that "if state or local authorities, acting in collusion with the federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment" a different result might apply); *United States v. Hatley*, No. 4:08-CR-595CAS, 2009 WL 1124958, at *3 (E.D. Mo. Apr. 27, 2009) (stating that "[c]ourts that have interpreted Rule 5(a) conclude that, unless there is some collusion between local authorities and federal authorities in the arrest of an individual on a federal criminal charge, the rights embodied in Rule 5(a) attach only after the defendant is brought into federal custody," and citing cases).  A defendant's statement "must be suppressed if the defendant could demonstrate the existence of improper collaboration between federal and state or local officers."  *Alvarez-Sanchez*, 511 U.S. at 359 (quoting *Anderson v. United States*, 318 U.S. 350 (1943)).

Defendant Raleigh has provided no evidence that there was any such "improper collaboration between federal and state or local officers."  Defendant Raleigh argues that the alleged delay between the indictment on January 20, 2010, and the first appearance on January 26, 2010, was purposeful in order to

provide the investigators with an opportunity to obtain a confession from him. The only record evidence on this issue shows that (1) Assistant U.S. Attorney Paulson filed the application for Writ of Habeas Corpus Ad Prosequendum on January 22, 2010, which set the first appearance for January 26, 2010; (2) Agent Parker and Sergeant Bergren acted alone in deciding to talk to Defendant Raleigh "one more time" on January 25, 2010 (Tr. 141); and (3) Agent Parker and Sergeant Bergren did not inform Attorney Paulson that they intended to meet with Defendant Raleigh on January 25, 2010, and only spoke with Attorney Paulson after obtaining Defendant Raleigh's statements in the January 25, 2010 interview. The record shows no evidence of collusion between Attorney Paulson and Agent Parker and Sergeant Bergren or any evidence of collusion between federal officers and the state officers involved in Defendant Raleigh's detention. Obviously, Defendant Raleigh was not arrested or detained by state authorities in Oak Park Heights in "order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment." *Alvarez-Sanchez*, 511 U.S. at 359. Rather, he was serving a life sentence in state prison for an unrelated murder.

Based on all of the above, this Court concludes that the Government did not violate Rule 5 or Rule 9 of the Federal Rules of Criminal procedure. Accordingly, Defendant Raleigh's January 25, 2010 statements should not be suppressed on these grounds.

**B.    Rule 11 and Rule 410**

Defendant Raleigh also asserts that Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 require that the statements he made during the January 25, 2010 interview with Officer Bergren and Agent Parker be suppressed because they were made in the course of plea discussions.  The Government contends that Defendant Raleigh misinterprets Rules 11(f) and 410 and that neither rule was implicated in this case because Defendant Raleigh was not engaged in plea discussions when he made the statements on January 25, 2010.

According to Rule 11, "[t]he admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410."  Fed. R. Crim. P. 11(f).  Rule 410 provides that evidence of "any statement made in the course of plea discussions *with an attorney* for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn" is not "admissible against the defendant who made the plea or was a participant in the plea discussions."  Fed. R. Evid. 410 (emphasis added).  The plain language of Rule 410 excludes "only those statements which are made in the course of plea discussions."  *United States v. Hare*, 49 F.3d 447, 450 (8th Cir. 1995) (internal quotations and citation omitted).  Therefore, "[s]tatements voluntarily offered either before any plea negotiation has begun or after a plea agreement has been reached cannot be considered statements made 'in the

85

course of plea discussions' within the meaning of the exclusionary rules." *Id.*

Defendant Raleigh's statements to Sergeant Bergren and Agent Parker were obviously not part of a discussion he had with an "attorney for the prosecuting authority." Fed. R. Evid. 410. Therefore, the initial question that this Court must address is whether law-enforcement personnel, other than United States government attorneys, can engage in plea-bargain negotiations that are subject to the evidentiary proscriptions of Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410. The Eighth Circuit addressed this question in *United States v. Grant*, 622 F.2d 308 (8th Cir. 1980). The defendant in *Grant*, like Defendant Raleigh here, argued that non-lawyer government agents could be found to have engaged in Rule 410 plea negotiations, even if the agents lacked actual authority to negotiate a plea, if the accused reasonably believed that the authority existed. Under the defendant's approach, which focuses on the defendant's subjective belief, the relevant factor is the defendant's perception of the government official's actual authority. *Id.* at 313.[21] In *Grant*, however, the Eighth Circuit rejected this approach. It concluded that the better approach was to only extend the evidentiary proscriptions of Fed. R. Crim. P. 11(e)(6) (which is now Fed. R.

---

[21] Here, Defendant Raleigh specifically argues that the Court should apply the two-tiered analysis set forth by the Fifth Circuit in *United States v. Robertson*, 582 F.2d 1356 (5th Cir. 1978). There, the Fifth Circuit stated that the "initial inquiry must be focused on the accused's perceptions of the discussion" and that the analysis should be (1) "whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion" and (2) "whether the accused's expectation was reasonable given the totality of the objective

(Footnote Continued on Next Page)

Crim. P. 11(f)), and Fed. R. Evid. 410, to an accused's discussions with a government attorney, not to his or her discussions with non-attorney agents—except in circumstances where a non-attorney law-enforcement official is acting with the express authority from a government attorney to negotiate a plea. *See Grant*, 622 F.2d at 313. Thus, applying Rule 11(f) and Rule 410 to the facts of this case, where there was no government attorney in the discussion, the key inquiry is whether the government attorney gave the agents express authority, not Defendant Raleigh's perception of the agent's authority.

This, however, does not end the inquiry. In *Grant*, the Eighth Circuit noted that statements made to non-attorney law-enforcement agents, "especially when the agents purport to have authority to bargain, are [not] inevitably admissible. Rather, the point is that such cases are not covered by the per se rule of 11(e)(6), and thus must be resolved by that body of law dealing with police interrogations." *Id.* In other words, the law of voluntary confessions applies, and the ultimate question to be answered here is whether Defendant Raleigh's statement was "the product of an essentially free and unconstrained choice or the result of an overborne will." *Id.* at 316-17 (quotations omitted). The Court is to examine the totality of the circumstances and the factors surrounding the occurrence when the statement was made to determine voluntariness. *Id.* at 316. Thus, following Grant, this Court must first consider whether the agents

(Footnote Continued from Previous Page)
circumstances." *Id.* at 1366.

involved in the January 25, 2010 discussions with Defendant Raleigh had

express authority to engage in plea negotiations and, second, if they did not have

express authority, whether Defendant Raleigh voluntarily made the statements

he now seeks to suppress.

As this Court describes in more detail below, the agents had no authority,

express or implied, to plea bargain, and the incriminating statements were

voluntarily made by Defendant Raleigh.  There is no evidence that Sergeant

Bergren or Agent Parker had express authority to plea bargain with Defendant

Raleigh.  They did not represent themselves as attorneys for the government or

imply that they had any authority to engage in plea negotiations.  And there is no

evidence that Defendant Raleigh's statements came from anything other than his

free and unconstrained choice.

Defendant Raleigh did not testify at the suppression hearing; instead, he

relies on Agent Parker's FBI 302 report (as does the Government), for what

occurred on January 25, 2010, during the discussion between Defendant Raleigh

and the officers.  (*See* Raleigh Ex. 3.)  The 302 states that the discussion began

as follows:

> Raleigh was asked if he was aware that he had been charged in the
> triple homicide.  He said that he was aware of that and that he
> wanted to know why the investigators were there.  The investigators
> said that they wanted to question him about the case.  He then said
> that he would be willing to plead out or "tap out" and he wanted to
> know what the best and worst case scenarios would be if he pleaded
> guilty.  At this point, Raleigh was told that before having any
> discussions regarding the case, the investigators needed to read
> him his Miranda rights.  SA Parker read the form FD-395 to Raleigh.

> Raleigh said that he understood and then signed the waiver and
> provided the following information[.]

(Raleigh Ex. 3.)  Nothing in the above description of events indicates that the

officers implied that they had authority to engage in plea negotiations with

Defendant Raleigh.  The officers told Defendant Raleigh that they "wanted to

question him about the case," they did not say that they wanted to engage in plea

negotiations.  And the officers told Defendant Raleigh that "before having any

discussions regarding the case," they would need to read him his *Miranda* rights;

they did not say that they needed to read him his *Miranda* rights before having

any plea negotiations regarding the case.[22]

Further, after the *Miranda* warnings were given, when "Raleigh asked what

were the best and worst possible punishments for him in the case[,] [t]he

---

[22]    It appears that Defendant Raleigh challenges the validity of the *Miranda* waiver by stating that "[i]f it was a waiver of anything, it was simply a waiver to speak about a possible plea, <u>nothing else</u>."  (Def. Raleigh's Mem. 20.) Defendant suggests possible coercion and impropriety on the part of the officers for having Defendant Raleigh sign the *Miranda* waiver knowing that they would not and were not authorized to discuss the topic of the plea.  This Court finds no evidence of such coercion or impropriety in the record presented.  And the waiver was in no way limited or confined to plea negotiations.  The officers informed Defendant Raleigh of his *Miranda* rights and had him sign a waiver form immediately at the start of the interview as soon as he volunteered that he would be willing to "tap out."  The waiver clearly stated that Defendant Raleigh had the right to remain silent and had the right to speak to a lawyer and/or have a lawyer present for the questioning.  (Gov't Ex. 22.)  The waiver also clearly stated that *anything* Defendant Raleigh stated could be used against him in court.  (*Id.*)  Not only was the *Miranda* waiver valid, but Defendant Raleigh's signing of the waiver and voluntarily proceeding to make incriminating statements to officers after being warned that any statements could be used against him further indicates that the subsequent discussions were not plea negotiations.

investigators said that they dealt with investigating the case and that punishment was for others to deal with." (Raleigh Ex. 3.) And when Raleigh mentioned hearing about the death penalty, Agent Parker "explained to Raleigh that he could not discuss that issue with Raleigh." (*Id.*) Then, when Raleigh "asked whether a deal could be made for him to plead and receive additional life sentences[,] [t]he investigators stated that it might be possible but that they could not make promises like that and that it would be better if lawyers spoke about those conditions." (*Id.*) And, at the end of the conversation, Agent Parker explained to Defendant Raleigh that he would be brought to federal court where he could have a lawyer represent him "and that his lawyer could deal directly with the prosecutor on his behalf." (*Id.*) Agent Parker also explained that "[t]he lawyers could then determine if a plea such as the one he suggested would be possible." (*Id.*) Defendant Raleigh then stated that "he wanted to go forward to see if that plea could be made. He said that if that were the case, then he would sit down with investigators . . . and he would tell what happened." (*Id.*) Therefore, the description of events that occurred after the *Miranda* warnings were given also indicate that the officers did nothing to imply that they had authority to engage in plea negotiations with Defendant Raleigh; in fact, the description indicates the opposite—that the officers made it clear to Defendant Raleigh that they could not talk about his punishment and that it was lawyers, not them, who would discuss a plea with him.

All of the above circumstances support the conclusion that Sergeant

Bergren and Agent Parker had no express or even implied authority to plea

bargain with Defendant Raleigh and they did not do so. And, as discussed

above, the statements made by Defendant Raleigh after the *Miranda* warning

was given were voluntary in nature. Defendant Raleigh's statements were not

"extracted by any sort of threats or violence, (or) obtained by any direct or implied

promises, however slight, (or) by the exertion of any improper influence." *Grant*,

622 F.2d 316 (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).

Further, the voluntariness of Defendant Raleigh's statements is buttressed by the

fact that what was going on in the discussion was that Defendant Raleigh was

making some incriminating statements as part of his unilateral attempt to

convince the officers that the Government should deal with him. He was trying to

entice the officers by claiming that he could tell the whole story about what

happened if a plea deal could be worked out in which he received additional life

sentences and avoided the death penalty. Therefore, based on the fact that

Sergeant Bergren and Agent Parker had no express or implied authority to plea

bargain with Defendant Raleigh, and on the fact that Defendant Raleigh's

statements were voluntarily made, this Court concludes that the statements

should not be suppressed.

Furthermore, even if Defendant Raleigh could somehow show that the

officers did have authority to plea bargain, his incriminating statements would

nevertheless not be inadmissible under Rule 410 because the statements were

not made in the course of a Rule 410 plea discussion.  The Eighth Circuit has

explained that courts are to "look to the specific facts of each case and the

totality of the circumstances to determine whether the defendant's statements

were made 'in the course of plea discussions.'"  *United States v. Edelmann*, 458

F.3d 791, 804 (8th Cir. 2006) (quoting *Hare*, 49 F.3d at 451).  In examining the

totality of the circumstances to determine whether there was a plea discussion,

the Eighth Circuit has held that no plea discussion occurred where:

> (1) no specific plea offer was made; (2) no deadline to plead was
> imposed; (3) no offer to drop specific charges was made; (4) no
> discussion of sentencing guidelines for the purpose of negotiating a
> plea occurred – only generalized discussion to give the suspect an
> accurate appraisal of his situation occurred; and (5) no defense
> attorney was retained to assist in the formal plea bargaining process.

*United States v. Morgan*, 91 F.3d 1193, 1196 (8th Cir. 1996).  Just as there were

no plea discussions in *Morgan*, none occurred here.  The officers made no plea

offer to Defendant Raleigh, imposed no deadline to plead, and made no offer to

drop specific charges.  To the contrary, the officers told Defendant Raleigh that

they were unable to discuss a plea with him and that any plea would have to be

determined through the use of the attorneys in the case.  Also, there was no

discussion of sentencing guidelines for the purpose of negotiating a plea.

Although Defendant Raleigh asked the investigators about the possibility of a

death-penalty charge, and the alternative of a plea to three life sentences, the

officers informed Defendant Raleigh that they were unable to discuss the issue of

the death penalty and that "punishment was for others to deal with." (Raleigh Ex. 3.) In addition, no defense attorney had been retained or appointed to assist Defendant Raleigh in the formal plea bargaining process. Therefore, no formal plea-discussion events occurred in the present case. *See Morgan*, 91 F.3d at 1196.

> As the Eighth Circuit stated in *Morgan* and *Hare*:

> [Defendant's] statements were offered unconditionally in an effort to cooperate. Perhaps [Defendant] was hopeful of improving his situation and eventually gaining a motion for substantial assistance at sentencing, but the statements cannot be said to have been made in the course of plea discussions within the meaning of the exclusionary rules because no plea bargain was offered or even contemplated at that point.

*Morgan*, 91 F.3d at 1196 (quoting *Hare*, 49 F.3d at 451). Defendant Raleigh's statements should instead be properly construed as voluntary statements made before plea discussions have begun. *See Hare*, 49 F.3d at 450 (8th Cir. 1995) ("Statements voluntarily offered either before any plea negotiation has begun or after a plea agreement has been reached cannot be considered statements made 'in the course of plea discussions' within the meaning of the exclusionary rules.")

Based on all of the above, this Court concludes that Defendant Raleigh's January 25, 2010 statements were not made to someone with plea-bargaining authority, were voluntarily made, and were not made in the course of plea discussions, thus not implicating the protections of the exclusionary rules. Thus,

this Court recommends that Defendant Raleigh's motion to suppress the January 25, 2010 statements be denied.

### III. Defendant Lindsey's and Defendant Raleigh's Motions to Suppress Based on Interception of Jail Calls and Jail Mail

Defendants Lindsey and Raleigh move to suppress all evidence derived from the warrantless search of mail and telephone calls they sent and received while in prison, arguing that to admit such evidence would violate their Fourth Amendment protections against unreasonable searches and seizures. The Government opposes the motion, arguing that Defendants Lindsey and Raleigh have no reasonable expectation of privacy in their mail and telephone calls while they are in prison.

The Fourth Amendment protects people, not places, from unreasonable searches and seizures. *Katz v. United States*, 389 U.S. 347, 351 (1967). Conversations fall within the Fourth Amendment's protections, and use of electronic devices to capture the contents of a conversation is a search. *Berger v. New York*, 388 U.S. 41, 51 (1967). The claimant must still, though, have an expectation of privacy in that conversation that society recognizes as reasonable in order to prevail. *E.g.*, *Minnesota v. Olson*, 495 U.S. 91, 98 (1990).

The Fourth Amendment protects prison inmates from unreasonable searches and seizures, but their reasonable expectation of privacy is far lower than that of most other individuals. *Levine v. Roebuck*, 550 F.3d 684, 687 (8th Cir. 2008); *see also Hudson v. Palmer*, 468 U.S. 517, 525–28 (1984) (holding

that prisoners' fourth amendment rights retained while in prison are limited); *Bell v. Wolfish*, 441 U.S. 520, 558–60 (1979) (same); *Stroud v. United States*, 251 U.S. 15 (1919) (same); *Lyon v. Farrier*, 727 F.2d 766, 769 (8th Cir. 1984) (same). Prisoners retain some Fourth Amendment rights, but those rights are necessarily reduced "because of the nature of incarceration and the myriad of institutional needs and objectives of prison facilities." *United States v. Peoples*, 250 F.3d 630, 637 (8th Cir. 2001).

Regarding phone calls, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511, prohibits warrantless interception of oral or wire communications and prevents admission of such recordings into evidence unless a specific exception in the Act applies. It is not unlawful, however, for law enforcement officials to "intercept a wire, oral, or electronic communication, where . . . one of the parties to the communication has given prior consent." 18 U.S.C. § 2511(2)(c). A prisoner who is aware of a prison's policy to record and/or monitor all prisoner phone calls impliedly consents to such monitoring by choosing to make a phone call. *United States v. Horr*, 963 F.2d 1124, 1127 (D. Minn. 1992); *see also United States v. Morin*, 437 F.3d 777, 780 (8th Cir. 2006) (holding that a prisoner handbook and signs informing defendant of call monitoring policy supported a finding of implied consent); *Friedman v. United States*, 300 F.3d 111, 122-23 (2d Cir. 2002) (holding that a sign stating that calls from jail cells would be recorded constituted sufficient notice to support a finding

of implied consent).

Defendant Lindsey was in custody as a pre-trial detainee from March 26, 2007, through December 13, 2007, at the Ramsey County Law Enforcement Center, and thereafter as a convicted criminal at St. Cloud Prison, Oak Park Heights, and Sherburne County Jail.  Defendant Raleigh was in custody as a convicted criminal at St. Cloud Prison, Oak Park Heights, and Sherburne County Jail for various periods from September 10, 2008, through the present.  A sign stating that calls may be recorded stood next to every phone Defendant Lindsey and Defendant Raleigh used while in custody at Ramsey County, Oak Park Heights, or Sherburne County.  (Gov't Ex. 9, 10, 11, 14, 19, 20.)  And every time Defendant Lindsey or Defendant Raleigh picked up the phone, regardless of which jail or prison they were at, a recording reminded them that their calls could be monitored and/or recorded.  In addition, the handbook provided to prisoners at Sherburne County jail states that telephone calls are recorded.  (Gov't Ex. 18.)  Further, when inmates enter the state prison system, they go through an initial orientation process that informs them that their phone calls can and will be monitored.  (Tr. 59.)  Both Defendant Lindsey and Defendant Raleigh chose to use the phones despite these clear warnings, and their use constitutes implied consent to such recording.  Having impliedly consented to having their calls recorded, neither Defendant Lindsey nor Defendant Raleigh has an objectively reasonable expectation of privacy in those calls.  *See, e.g., United States v.*

96

*Eggleston*, 165 F.3d 624, 626 (8th Cir. 1999) ("If someone agrees that the police may listen to his conversations and may record them, all reasonable expectation of privacy is lost, and there is no legitimate reason to think that the recordings, like any other evidence lawfully discovered, would not be admissible.").

Defendant Lindsey and Defendant Raleigh's argument against the admissibility of their jail mail fails for similar reasons. Prison officials do not commit a constitutional violation by reading a prisoner's outgoing mail because prison officials have an interest in screening mail for contraband and threats to prison safety and security. *Smith v. Delo*, 995 F.2d 827, 830 (8th Cir. 1993). At the beginning of Defendant Raleigh's incarceration in September 2008, he was notified of the following:

> In order to protect the public and ensure the security, good order and discipline of all Minnesota Department of Corrections facilities, all offender communications, including mail, telephone and in-person communication are subject to monitoring.

(Gov't Ex. 8.) Defendant Raleigh signed a notice acknowledging this prison policy for all Minnesota Department of Correction facilities. (*Id.*) Defendant Lindsey was given a similar notification that his mail was subject to monitoring at his prison orientation at St. Cloud, and he signed a notice acknowledging the prison policy for all Minnesota Department of Correction facilities. (Gov't Ex. 7.) Defendant Lindsey also signed the Communication Monitoring Notice to Inmates at Oak Park Heights, which stated that "[a]ll person-to-person phone and mail communications are subject to monitoring by institution and/or other authorities

. . . . Monitoring may consist of the recording your phone communication by means of electronic equipment. Incoming and outgoing mail may be read and photo copied." (Gov't Ex. 21.) In addition, Defendant Lindsey was provided an Inmate Handbook at the Ramsey County Adult Detention Center, which is where he began his incarceration, which states: "All incoming mail will be opened and inspected . . . . All outgoing mail will be given to an Officer unsealed. This mail is subject to inspection." (Gov't Ex. 12 at 14.) Considering both Defendant Lindsey and Defendant Raleigh's awareness and acknowledgement of the Minnesota Department of Corrections' policy of monitoring all inmate mail, they had (and have) no objectively reasonable expectation that their mail will remain private. *Cf. Horr*, 963 F.2d at 1126 n.3 (stating that admitted knowledge of a monitoring policy eliminates a prisoner's objectively reasonable expectation of privacy).

Furthermore, because Defendant Lindsey and Defendant Raleigh had no objectively reasonable expectation that their phone calls or mail would remain private, they had no objectively reasonable expectation of privacy in the use of those mails and phone calls for purposes of investigation. The signage and recorded warnings provided to both Defendants regarding the monitoring of their phone calls were not limited; for example, they were not told that the calls might be monitored only if necessary for prison security purposes. And, with regard to both mail and phone calls, both Defendants were provided with, and

acknowledged, that *"[i]n order to protect the public* and ensure the security, good order and discipline of all Minnesota Department of Corrections facilities, all offender communications, including mail, telephone and in-person communication are subject to monitoring." (Gov't Ex. 8 (emphasis added).) By notifying the Defendants that their mail and phone calls are subject to monitoring "in order to protect the public," they were on notice that their mail and phone calls may be subject to being provided to law enforcement, or anyone else, if it were for the purpose of protecting the public. Investigating crimes serves the purpose of protecting the public. Therefore, given the global warnings that Defendants received, they had no reasonable expectation that their jail phone calls and jail mail would not be monitored and provided to law-enforcement agencies investigating crimes. As such, neither Defendant Lindsey nor Defendant Raleigh suffered a Fourth Amendment violation.

Based on all of the above, both Defendants Lindsey's and Raleigh's motions to suppress evidence derived from and including their mail and phone calls sent and received from prison should be denied.

## IV.    Defendant Lindsey's and Defendant Raleigh's Motions for Severance

Two or more defendants may be charged in the same indictment if they are alleged to have participated in the same transaction or series of incidents constituting an offense or offenses. Fed. R. Crim. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together."

*Zafiro v. United States*, 506 U.S. 534, 537 (1993). Further, persons charged with conspiracy should generally be tried together and it will rarely be improper for co-conspirators to be tried together. *United States v. Kindle*, 925 F.2d 272, 277 (8th Cir. 1991); *United States v. Stephenson*, 924 F.2d 753, 761 (8th Cir. 1991); *see also United States v. Abdul-Ahad*, Crim. No. 08-142(7) (DSD/SRN), 2009 WL 35473, at *2 (D. Minn. Jan. 5, 2009) ("Co-conspirators 'will generally be tried together.'") (quoting *United States v. O'Meara*, 895 F.2d 1216, 1218 (8th Cir. 1990)). Joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537 (quotations omitted). But courts have discretion under Fed. R. Crim. P. 14(a) to sever co-defendant trials or joinder of offenses where the joinder of the trials may result in real prejudice to one of the defendants. *United States v. Wadena*, 152 F.3d 831, 848 (8th Cir. 1998).

Here, Defendants Lindsey and Raleigh have each filed a motion for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Specifically, Defendant Lindsey asserts that a joint trial will unfairly prejudice him and deny him a fair trial because it is likely that the Government will attempt to introduce evidence that Defendant Raleigh has pled guilty in an unrelated case to first-degree murder in state court and is serving a life sentence without parole. Defendant Lindsey asserts that a limiting instruction would not be sufficient to ensure that the jury would not be confused regarding why Raleigh's prior plea

and sentence would be admissible, and would not ensure that there would be no spill-over effects on Defendant Lindsey's case. Defendant Lindsey also asserts that there are "markedly different degrees of culpability" and that he would be deprived of "exculpatory evidence" because Defendant Raleigh would object to the "evidence adduced at the suppression hearing [showing] that Mr. Lindsey is not the shooter in this case," from being introduced at trial. (Def. Lindsey's Mem. 33.)

Defendant Raleigh in turn asserts that a joint trial will unfairly prejudice him and deny him a fair trial because of the prejudicial spill-over effect of the evidence admissible against Defendant Lindsey, but inadmissible as to Defendant Raleigh, and also because this case involves extremely serious and sensational charges. In addition, Defendant Raleigh contends that the jury will likely have a difficult time compartmentalizing the evidence against each Defendant because of the nature and amount of the evidence.

Further, Defendant Lindsey asserts that the extra-judicial statements made by Defendant Raleigh may incriminate Defendant Lindsey in violation of his Sixth Amendment right to confrontation, should Defendant Raleigh choose not to testify, citing *Bruton v. United States*, 391 U.S. 123, 126 (1968). And Defendant Raleigh asserts the same argument regarding statements made by Defendant Lindsey. This Court addresses the Defendants' concerns below, beginning with their *Bruton* claims.

## A.    *Bruton* claims

Defendants have a Sixth Amendment right to confront the witnesses against them, and a Fifth Amendment right not to be made witnesses against themselves.  "In a joint trial, these rights collide when co-defendants implicate each other in confessions that are introduced into evidence."  *United States v. Ortiz*, 315 F.3d 873, 899 (8th Cir. 2002).  In *Bruton*, the Supreme Court held that instructing the jury to consider the confession of a particular defendant only against that defendant, and not against his co-defendant, was insufficient to protect the co-defendant's rights.  391 U.S. at 137; *see also United States v. High Elk*, 442 F.3d 622, 625 (8th Cir. 2006) ("*Bruton* is grounded on the Sixth Amendment right to confrontation and prohibits the admission of an out-of-court confession by a nontestifying defendant implicating a co-defendant by name in the crime.").  However, *Bruton* applies only to facially incriminating confessions.  *United States v. Logan*, 210 F.3d 820, 822 (8th Cir. 2000).  *Bruton* does not apply when a co-defendant's statements do not incriminate the defendant either on their face or when considered with other evidence.  *United States v. Rashid*, 383 F.3d 769, 777 (8th Cir. 2004).  Therefore, "[i]f a co-defendant's confession does not incriminate the defendant on its face, but does so only when linked to additional evidence, it may be admitted if a limiting instruction is given to the jury and the defendant's name is redacted from the confession."  *Id.*  This is because "[i]f the non-testifying defendant's confession is capable of being redacted to

eliminate any indication that the defendant existed, such a statement loses its prejudicial impact." *United States v. Martin*, No. CRI. 02-127 (ADM/AJB), 2002 WL 31426191, at *4 (D. Minn. Oct. 28, 2002) (citing *Richardson v. Marsh*, 481 U.S. 200, 209 (1987)).

Accordingly, a statement must be "redacted to eliminate not only the defendant's name, but any reference to his or her existence" in order to avoid violation of the Confrontation Clause. *Richardson*, 481 U.S. at 211. Where a redacted statement leaves "no indication whatever that there had been a redaction," no link to the defendant remains. *Logan*, 210 F.3d at 823. Further, redactions replacing the defendant's name with "another individual," or words like "we," "they," and "someone" are permissible. *See id.* at 821-22; *United States v. Edwards*, 159 F.2d 1117, 1125-26 (8th Cir. 1998). However, where a redacted co-defendant's statement has obviously been redacted, it "point[s] a finger directly at [the defendant]" even without mentioning his or her name, and is not sufficient. *Logan*, 210 F.3d at 822. Accordingly, "redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results." *Gray v. Maryland*, 523 U.S. 185, 195 (1998).

Here, the question is whether or not the statements of Defendants can be redacted to delete the non-confessing Defendants' names such that the

redaction does not "notify the jury" that the Defendants' names have been deleted. The Government has submitted for *in camera* review the statements that potentially implicate *Bruton*'s protections, and it represents that it does not intend to offer the written documents/statements into evidence at trial, but instead intends to have the witnesses testify live. Nonetheless, the Government has proposed its redactions showing how it intends to instruct the witness to avoid using the name of a co-defendant at trial. This Court has carefully reviewed the relevant statements and the Government's proposed redactions/instructions, as they stand, and concludes that the proposed redactions/instructions are sufficient to protect Defendant Lindsey and Defendant Raleigh's right to confrontation and thus severance is not necessary. Of course, further *Bruton* protections can be re-evaluated at trial when the actual testimony is proffered.

### B.    Other arguments

With regard to Defendants' other arguments, there is a presumption that "[p]ersons charged in a conspiracy or jointly indicted on similar evidence from the same or related events should be tried together, even if each defendant did not participate in or was not charged with each offense." *United States v. Gravatt*, 280 F.3d 1189, 1191 (8th Cir. 2002). A court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. "A general

complaint of prejudice is an insufficient basis for severance." *Abdul-Ahad*, 2009

WL 35473, at *2. The Eighth Circuit has stated:

> Because defendants who are jointly indicted on similar evidence
> from the same or related events should normally be tried together, to
> warrant severance a defendant must show real prejudice, that is,
> something more than the mere fact that he would have had a better
> chance for acquittal had he been tried separately. A defendant can
> demonstrate real prejudice to his right to a fair trial by showing
> (a) his defense is irreconcilable with that of his co-defendant or
> (b) the jury will be unable to compartmentalize the evidence as it
> relates to the separate defendants . . . . The risk of prejudice posed
> by joint trials is best cured by careful and thorough jury instructions.

*United States v. Michelson*, 378 F.3d 810, 817-18 (8th Cir. 2004). In other

words, severance is not easily granted, and alternative, less drastic measures

addressing the potential for prejudice are preferred. *See Zafiro*, 506 U.S. at 537,

538-39; *United States v. Flores*, 362 F.3d 1030, 1039 (8th Cir. 2004).

The co-defendants in this case have been indicted for conspiring with one

another to distribute controlled substances, aiding and abetting one another with

respect to possessing a firearm in relation to a drug-trafficking crime, and aiding

and abetting one another with respect to three murders committed in relation to a

drug-trafficking crime. The record before this Court suggests that "proof of the

charges against each of the Defendants is based on the same evidence and

acts." *See O'Meara*, 895 F.2d at 1218 (citing *United States v. Voss*, 787 F.2d

393, 401 (8th Cir. 1986)). Under these circumstances, the general rule in the

Federal system is that Defendants Lindsey and Raleigh should be tried together.

Defendant Lindsey and Defendant Raleigh's motions contain several conclusory

and speculative statements regarding prejudice as a result of a joined trial. Such general complaints of prejudice are insufficient to warrant severance. The likelihood of prejudice frequently arises from the possibility that the jury will hear otherwise inadmissible evidence. However, the record before this Court does not suggest how either Defendant is unduly prejudiced by joinder with the other Defendant in this case to the extent necessary to overcome the preference for joinder of defendants in conspiracy-related cases. "[T]here is no requirement that, in order to allow a joint [t]rial, the evidence against each defendant must be quantitatively or qualitatively equivalent." *United States v. Finn*, 919 F. Supp. 1305, 1324-25 (D. Minn. 1995). Nor does the "mere existence of generally antagonistic defense . . . necessitate a severance." *United States v. Abfalter*, 340 F.3d 646, 652 (8th Cir. 2003) (quotations omitted). And, "[t]he mere fact that . . . one defendant may try to save himself at the expense of another is not sufficient grounds to require separate trials." *Gravatt*, 280 F.3d at 1191.[23]

Although severance may be appropriate when defendants are tried in a complex case with markedly different degrees of culpability, *Flores*, 362 F.3d at 1040-41, this case only involves two defendants and four counts. As explained

---

[23]     Thus, for example, even though Defendant Lindsey may assert that he was not the shooter, that does not necessarily absolve him of responsibility, and because the jury is not required to disbelieve one defendant in order to believe the other, severance is not appropriate on this basis. *See Flores*, 362 F.3d at 1040 (stating that mutually antagonistic defenses sufficient to warrant severance "exist when the jury must disbelieve the core of one defense in order to believe the core of the other").

in *United States v. Prime Plating, Inc.*, No. CRIM.04-208 (JRT/FLN), 2004 WL 2801595, at *4 (D. Minn. Nov. 24, 2004):

> The jury will be carefully instructed as to each count and as to any evidence that is to be considered only for certain purposes or against particular defendants. The jury will also be cautioned that each defendant is to be considered individually. Thus, the Court is confident that the jury will be able to distinguish between the defendants, between the charges brought against the defendants, and between the evidence pertaining to the particular charges and defendants.

This Court agrees. It is only speculation that a jury would be unable to distinguish and apply the evidence relating to one Defendant from evidence relating to the other Defendant.

Because neither Defendant Lindsey nor Defendant Raleigh has shown that severance is necessary to avoid risk of compromising any specific trial right to which he is entitled or is necessary to prevent the jury from making a reliable judgment as to his guilt or innocence, this Court recommends that Defendant Lindsey's and Defendant Raleigh's motions for severance be denied.

## RECOMMENDATON

Based on the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that**:**

1.      Defendant Lindsey's Motion for Suppression of Evidence Obtained by Search and Seizure (Doc. No. 107), be **DENIED**;

2.      Defendant Lindsey's Motion for Severance and for Disclosure of Co-Defendant's Statements (Doc. No. 114), be **DENIED**;

3.      Defendant Lindsey's Motion to Suppress Statements with

Incorporated Legal Authority (Doc. No. 119), be **GRANTED IN PART** and

**DENIED IN PART**;

4.      Defendant Raleigh's Motion for Suppression of Evidence Obtained

by Search and Seizure (Doc. No. 71), be **DENIED**;

5.      Defendant Raleigh's Motion to Suppress Statements with

Incorporated Legal Authority (Doc. No. 72), be **DENIED**; and

6.      Defendant Raleigh's Motion for Severance and for *In Camera*

Review of Co-Defendant's Statements (Doc. No. 80), be **DENIED**.


Date:  July 20, 2010


                                    _s/ Jeffrey J. Keyes_____
                                    JEFFREY J. KEYES
                                    United States Magistrate Judge


        Under D.Minn. LR 72.2(b) any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**August 3, 2010**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **14 days** after service thereof.  All briefs filed under
this rule shall be limited to 3500 words.  A judge shall make a de novo
determination of those portions of the Report to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable directly to the Circuit Court of
Appeals.