UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.                                                    Criminal No. 10-15 (JNE/JJK)
                                                    ORDER

Tyvarus Lee Lindsey (1) and
Rashad Raleigh (2),

        Defendants.

Tyvarus Lee Lindsey and Rashad Raleigh have been charged with one count of possession of a firearm in furtherance of a drug trafficking offense and three counts of murder resulting from the possession of a firearm in furtherance of a drug trafficking offense. The case is before the Court on a Report and Recommendation issued by the Honorable Jeffrey J. Keyes, United States Magistrate Judge. The magistrate judge recommended that Lindsey's Motion for Suppression of Evidence Obtained by Search and Seizure be denied, that Lindsey's Motion for Severance and for Disclosure of Co-Defendant's Statements be denied, and that Lindsey's Motion to Suppress Statements with Incorporated Legal Authority be granted in part and denied in part. The magistrate judge also recommended that Raleigh's Motion for Suppression of Evidence Obtained by Search and Seizure be denied, that Raleigh's Motion to Suppress Statements with Incorporated Legal Authority be denied, and that Raleigh's Motion for Severance and for *In Camera* Review of Co-Defendant's Statements be denied. Lindsey and Raleigh objected to the Report and Recommendation, and the government responded. The Court has conducted a de novo review of the record. *See* D. Minn. LR 72.2(b). Because the government had agreed not to use in its case in chief Lindsey's statements whose suppression the

magistrate judge recommended, the Court denies as moot Lindsey's motion to suppress those statements. The Court otherwise accepts the recommended decision.

### I. Lindsey's objections

**A.  Authority to consent to the search of the Minneapolis residence**

On March 26, 2007, Minneapolis police officers searched a Minneapolis residence. During the search, Lindsey was arrested. The officers went to the residence to look for one Marvin Waldrop, an individual wanted by authorities in Wisconsin. Two officers testified that a woman consented to the search. The magistrate judge found that "the woman acted with authority and familiarity at the door such that it was reasonable for the officers to rely on her authority to consent." Lindsey objects to this finding.

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *see Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009). However, "[t]he Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Randolph*, 547 U.S. at 106; *see United States v. Amratiel*, 622 F.3d 914, 915 (8th Cir. 2010) ("The Fourth Amendment does not prohibit the warrantless search of premises when police obtain valid consent."). In *Amratiel*, the Eighth Circuit explained that police may rely on consent given by one with common authority or apparent authority:

> Consent need not be given by the defendant, but rather may be given by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." A warrantless search is justified when an officer reasonably relies on a third party's demonstration of apparent

2

> authority, even if that party lacks common authority. Apparent authority exists when "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises."

622 F.3d at 915-16 (alteration in original) (citations omitted); *see Rodriguez*, 497 U.S. at 185-86; *United States v. Almeida-Perez*, 549 F.3d 1162, 1169-70 (8th Cir. 2008) ("Even if the police make a mistake of fact about the third party's authority over the premises, the search will be legal if the circumstances lead the police reasonably to believe that they have the consent of a third party with common authority.").

Three witnesses testified about the circumstances under which the officers entered the Minneapolis residence. The magistrate judge credited the testimony of two Minneapolis police officers, Ann Martin and Cheri Petersen, over the testimony of DaJuan Rayford.[1] The Court adopts this credibility determination.

Briefly summarized, the testimony of Martin and Petersen indicates that they went to the front door of the Minneapolis residence at approximately 10:15 a.m. on March 26. They were dressed in plainclothes, and their firearms were not displayed. Two other officers observed the side and back of the residence. Martin knocked, a woman opened the door from within the residence, and Martin and Petersen asked for consent to search the residence for Waldrop. The woman agreed. Petersen remained with the woman just inside the residence while Martin searched the residence for Waldrop. Martin found Lindsey in a bathroom. He was standing behind a shower curtain, he was fully clothed, and there was no water running in the shower. Martin asked Lindsey to come out, she noticed he was sweating profusely, and she asked him to identify himself. Lindsey identified himself. Given the circumstances in which Martin found

---

[1] The Court spells Rayford's first name as it appears in the transcript of his testimony.

Lindsey, the officers checked whether he was the subject of any arrest warrants.  After learning that there was a warrant for Lindsey's arrest, the officers arrested him.

In her testimony, Martin described the woman who came to the door as "a black female" who "was in her 20s to late 20s, maybe early 30s."  Martin did not know the woman's name.  Asked on direct examination whether the woman lived at the residence, Martin responded, "Yes."  On cross examination, Martin stated that she did not recall whether the woman actually lived at the residence.  Martin described the conversation that took place after the woman came to the door:

> We explained to her that we were there looking for Marvin Waldrop, that he was a noncompliant sex offender out of Wisconsin that had a warrant, and that his driver's license had been issued to him at that address, and asked for consent to look in the home for him.

According to Martin, the woman allowed Martin and Petersen to enter the residence.  Later, Martin testified that the woman had indicated that Waldrop was not at the residence:

> You know, when we work alone, we're very -- we've been very successful in doing things very politely, asking -- she stated that there was -- that the party we were looking for is not in the home.  From what I recall, she seemed believable.  But just to cover our bases, to be able to inform Racine County that we did indeed look, that he was not there, you know, do check for that reason, but . . .

Martin acknowledged that she had not obtained written consent to enter the residence and search for Waldrop.  She explained that she had received verbal consent, and she stated "that's all we generally receive on these entries or apprehensions."

In her testimony, Petersen described the woman who came to the door as a "[b]lack female" and "an adult."  Petersen testified that a conversation initially took place between Petersen, Martin, and the woman:

Q: Who had the conversation with the black female, you or Officer Martin?

> A: I think initially we probably both talked to her. But I stayed and talked to her a little longer.

Petersen testified that the woman agreed to allow the officers to search the residence for Waldrop. She described the conversation that took place:

> I actually -- I believe I stood there and talked to her, and explained who we were looking for, and asked her if she knew of any addresses we might be able to find this guy at if he wasn't here. And Officer Martin -- we asked, Do you mind if we look around, since his driver's license says that he lives here, and she said that was fine. And asked her if he was there, and she said, No, he's not here. Officer Martin was looking around while I was talking with her.

Lindsey asserts that "[t]he main problem with finding that the woman who answered the door acted with 'authority and familiarity' such that it was reasonable for the officers to rely on her authority to consent to the search, is that no one knows who she is, nor her relationship to the property." Lindsey maintains that "there are no facts in the record to show the mystery woman exercised any of the privileges of an occupant."

"The constant element in assessing Fourth Amendment reasonableness in the consent cases . . . is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules." *Randolph*, 547 U.S. at 111. "[A] solitary co-inhabitant may sometimes consent to a search of shared premises . . . [and] the reasonableness of such a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." *Id.* Referring to its decision in *United States v. Matlock*, 415 U.S. 164 (1974), the Supreme Court in *Randolph* stated that police officers may rely on a common understanding of the facts they encounter:

> *Matlock's* example of common understanding is readily apparent. When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did, she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants

> usually make about their common authority when they share quarters. They understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another. As *Matlock* put it, shared tenancy is understood to include an "assumption of risk," on which police officers are entitled to rely, and although some group living together might make an exceptional arrangement that no one could admit a guest without the agreement of all, the chance of such an eccentric scheme is too remote to expect visitors to investigate a particular household's rules before accepting an invitation to come in. So, *Matlock* relied on what was usual and placed no burden on the police to eliminate the possibility of atypical arrangements, in the absence of reason to doubt that the regular scheme was in place.

*Randolph*, 547 U.S. at 111-12.

Although "[s]ome circuits have interpreted [*Matlock*, *Rodriguez*, and *Randolph*] to require police to go behind appearances to verify third party authority," the Eighth Circuit "has been more liberal about allowing police to form their impressions from context." *Almeida-Perez*, 549 F.3d at 1171 (citing cases from the Tenth Circuit and the D.C. Circuit). Police officers certainly have "some responsibility . . . to assess the situation critically," but they "are entitled to draw the usual inferences from what they see and hear, even though further inquiry might prove the inferences wrong." *Id.* at 1170. "[W]here a person exercises privileges that would only be proper for an occupant of the house, the police may draw the inference that the person is indeed an occupant unless there are other circumstances that would cause a reasonable man to doubt the validity of that inference." *Id.* at 1171. "The question is not who comes to the door so much as it is whether whoever appears there projects an aura of authority upon which one can reasonably rely." *United States v. Rosario*, 962 F.2d 733, 738 (7th Cir. 1992).

As noted above, Martin and Petersen went to the front door of the Minneapolis residence at approximately 10:15 a.m. Martin knocked, and an adult came to the door from within the residence. *Cf. Randolph*, 547 U.S. at 111; *United States v. Jenkins*, 92 F.3d 430, 437 (6th Cir. 1996) (stating that a reasonable officer would usually assume that a person who comes to the door of a house after the police knock has authority over the house). The woman demonstrated

6

her familiarity with the occupants of the Minneapolis residence by telling the officers that Waldrop was not there. Without asking for permission or consulting anyone else in the residence, the woman agreed to allow the officers to search for Waldrop. The woman exercised the prerogative to admit strangers into the residence without giving the officers any reason to doubt her authority to invite them into the residence. On this record, the Court adopts the magistrate judge's finding that "the woman acted with authority and familiarity at the door such that it was reasonable for the officers to rely on her authority to consent." *See Almeida-Perez*, 549 F.3d at 1171; *United States v. Spotted Elk*, 548 F.3d 641, 653 (8th Cir. 2008); *Rosario*, 962 F.2d at 737-38.

**B.     Valid consent to the search of the Minneapolis residence**

Lindsey asserts that the officers failed to obtain valid consent to search the Minneapolis residence. The magistrate judge found that the woman who answered Martin's knock on the door of the Minneapolis residence voluntarily consented to the search. "Consent may be given orally, and *Miranda* warnings are not required for consent to be considered voluntarily given."[2] *United States v. Johnson*, 619 F.3d 910, 918 (8th Cir. 2010). To determine whether a person voluntarily gave consent, a court examines the totality of the circumstances. *Id.* (listing several relevant factors). Having reviewed the record, the Court adopts the finding that the woman voluntarily consented to the search of the Minneapolis residence for Waldrop.[3]

---

[2]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3]     Rayford testified that he answered the door. The magistrate judge did not find Rayford's testimony credible. Were it credited, the magistrate judge stated that it indicated Rayford voluntarily consented to the search. Based on Rayford's testimony, the magistrate judge also stated that "it is possible that the woman who answered the door was [Lindsey's girlfriend]." Nevertheless, the magistrate judge indicated that "[t]he identity of the woman who answered the door is unclear." Having concluded that a woman answered the door and that she voluntarily consented to the search, the Court need not consider Lindsey's objections to the magistrate judge's statements regarding Lindsey's girlfriend and whether Rayford consented to the search.

7

### C. Arrest warrant on March 26, 2007

Lindsey maintains that the magistrate judge erred by finding there was a valid warrant for his arrest on March 26, 2007. Because there was no valid arrest warrant, Lindsey argues, his statement to the police on March 26 should be suppressed. For the reasons stated in the Report and Recommendation, there was a valid arrest warrant for Lindsey on March 26. In addition, a putative administrative error would not render application of the exclusionary rule appropriate here. *See Herring v. United States*, 129 S. Ct. 695, 703-04 (2009).

### D. Question about a cell phone

After Lindsey's arrest, Minneapolis police officers brought Lindsey to the St. Paul police department where Sergeant Thomas Bergren interviewed Lindsey. Before advising Lindsey of his *Miranda* rights, Bergren asked questions about Lindsey's name, age, date of birth, and cell phone number. The magistrate judge concluded that the questions and responses fell within an exception to *Miranda* for routine booking questions. *See United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996). Lindsey objects to the conclusion that the question about the cell phone fell within this exception. The Court need not resolve this dispute. In a memorandum submitted to the magistrate judge, the government stated that "it does not intend to use Lindsey's response about the cellular telephone in its case in chief." To the extent Lindsey moves to suppress his response to Bergren's question about his cell phone number, the Court denies the motion as moot.

### E. Search of a cell phone and evidence derived from the phone

On March 26, 2007, Martin seized a cell phone from Lindsey. The next day, police obtained a search warrant for the data contained in the phone. On April 5, 2007, police obtained an order that authorized the use of a pen register and trap device on the phone. Lindsey objects

to the magistrate judge's conclusions that Lindsey lacked standing to challenge the search of the phone; that the application for the warrant and supporting affidavit established probable cause to issue the warrant; that the good-faith exception to the warrant requirement would apply even if probable cause did not exist; and that evidence obtained pursuant to the order authorizing the pen register and trap device need not be suppressed as "fruit of the poisonous tree." The Court overrules Lindsey's objections for the reasons stated in the Report and Recommendation.

**F.     Phone calls and mail in prison**

Lindsey moved to suppress evidence derived from warrantless searches of his mail and phone calls in prison. The magistrate judge recommended that the motion be denied because Lindsey did not have a reasonable expectation of privacy in mail and phone calls sent from or received in prison. Lindsey asserts that the magistrate judge erred by finding Lindsey waived any expectation of privacy in prison phone calls and mail. For the reasons stated in the Report and Recommendation, Lindsey lacked a reasonable expectation of privacy in phone calls and mail sent from or received in prison. *See United States v. Conley*, 531 F.3d 56, 58-60 (1st Cir. 2008) (O'Connor, J.); *United States v. Lucas*, 499 F.3d 769, 780 (8th Cir. 2007) (en banc); *United States v. Morin*, 437 F.3d 777, 780 (8th Cir. 2006); *United States v. Eggleston*, 165 F.3d 624, 626 (8th Cir. 1999); *United States v. Horr*, 963 F.2d 1124, 1126 (8th Cir. 1992); *United States v. Kelton*, 791 F.2d 101, 102-03 (8th Cir. 1986). The Court overrules Lindsey's objection.

**G.     Severance**

The magistrate judge recommended that Lindsey's motion to sever be denied. The magistrate judge concluded that Raleigh's statements could be redacted to avoid any violation of Lindsey's rights under *Bruton v. United States*, 391 U.S. 123 (1968). *See United States v. Sandstrom*, 594 F.3d 634, 647-49 (8th Cir. 2010). The magistrate judge also concluded that

Lindsey had not demonstrated prejudice that would warrant severance. *See United States v. Davis*, 534 F.3d 903, 916-17 (8th Cir. 2008). Lindsey objects. For the reasons stated in the Report and Recommendation, the Court denies Lindsey's motion to sever.

## II. Raleigh's objections

### A. Statements on January 25, 2010

Raleigh moved to suppress statements he made on January 25, 2010. In support, he asserted that he was not brought before a magistrate judge without unnecessary delay. *See* Fed. R. Crim. P. 5(a)(1)(A) ("A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge . . . ."); Fed. R. Crim. P. 9(a), (c)(1)(B) (stating that a court must issue a warrant for each person named in an indictment and that "[t]he officer executing the warrant must proceed in accordance with Rule 5(a)(1)"). He also maintained that the statements were made in the course of plea discussions, *see* Fed. R. Crim. P. 11(f); Fed. R. Evid. 410, and that his statements should be suppressed as a matter of fundamental fairness and due process. The magistrate judge recommended that Raleigh's motion be denied. Raleigh objects.

"Rule 5(a) of the Federal Rules of Criminal Procedure provides [an] arrested person shall be taken without unnecessary delay before a magistrate judge." *United States v. Jeanetta*, 533 F.3d 651, 655 (8th Cir. 2008). The protections of Rule 5(a) are not implicated when a person is in state custody, unless federal and state officials colluded to allow federal agents to interrogate the person in violation of his right to a prompt federal presentment. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 359 (1994); *Jeanetta*, 533 F.3d at 655-56. In this case, Raleigh was indicted on January 20, 2010. At that time, he was serving a life sentence in state custody for a murder unrelated to the instant charges. He remained in state custody on January 25, when an

FBI agent and Bergren interviewed him. The Court adopts the magistrate judge's finding that there was no collusion. Raleigh was transferred from state custody to federal custody on January 26 pursuant to a writ of habeas corpus ad prosequendum, and he appeared before a magistrate judge that day. There was no violation of Raleigh's right to prompt presentment. *See Jeanetta*, 533 F.3d at 655-56.[4]

"The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410." Fed. R. Crim. P. 11(f). Subject to exceptions not relevant here, Rule 410 provides that "any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn" is not "admissible against the defendant who made the plea or was a participant in the plea discussions." Raleigh objects to the magistrate judge's conclusions that he did not make statements on January 25 to someone with authority to engage in plea discussions, that his statements were not made in the course of plea discussions, and that he voluntarily made his statements. The Court adopts the Report and Recommendation and overrules Raleigh's objections.

**B. Phone calls and mail in prison**

Raleigh moved to suppress evidence derived from warrantless searches of his prison mail and telephone calls. The magistrate judge recommended that the motion be denied because

---

[4] In *Jeanetta*, shortly after the defendant had absconded, a federal indictment was returned against him in October 2005. 533 F.3d at 653. On June 1, 2006, the defendant was arrested. *Id.* He was taken into and held in state custody until he pleaded guilty to state charges. *Id.* After pleading guilty to the state charges, the defendant was released into federal custody on July 18, 2006. *Id.* He was arraigned on the federal indictment before a magistrate judge the next day. *Id.* The defendant argued that the government had violated Rule 5(a) by delaying his appearance before a magistrate judge for 49 days after his arrest. *Id.* at 655. The Eighth Circuit rejected this argument: "Because [the defendant] was in state custody the entire time, the protections of Rule 5(a) are not implicated. Further, [he] offers no evidence to suggest he was held in state custody at the direction of or in concert with federal officers. Thus, there was no violation of Rule 5(a)." *Id.* at 656.

Raleigh did not have a reasonable expectation of privacy in mail and phone calls sent from or received in prison. Raleigh asserts that the magistrate judge erred by finding Raleigh had no reasonable expectation of privacy in prison phone calls and mail. For the reasons stated in the Report and Recommendation, Raleigh lacked a reasonable expectation of privacy in phone calls and mail sent from or received in prison. The Court overrules Raleigh's objection. *See Conley*, 531 F.3d at 58-60; *Lucas*, 499 F.3d at 780; *Morin*, 437 F.3d at 780; *Eggleston*, 165 F.3d at 626; *Horr*, 963 F.2d at 1126; *Kelton*, 791 F.2d at 102-03.

**C.     Severance**

The magistrate judge recommended that Raleigh's motion to sever be denied. The magistrate judge concluded that Lindsey's statements could be redacted to avoid any violation of Raleigh's rights under *Bruton*. *See Sandstrom*, 594 F.3d at 647-49. The magistrate judge also concluded that Raleigh had not demonstrated prejudice that would warrant severance. *See Davis*, 534 F.3d at 916-17. Raleigh objects. For the reasons stated in the Report and Recommendation, the Court denies Raleigh's motion to sever.

### III.  Conclusion

In short, the Court has conducted a de novo review of the record. *See* D. Minn. LR 72.2(b). Based on that review, the Court denies as moot Lindsey's motion to suppress statements that the government agreed not to use in its case in chief. The Court otherwise accepts the recommended decision. Therefore, IT IS ORDERED THAT:

1. Lindsey's Motion for Suppression of Evidence Obtained by Search and Seizure [Docket No. 107] is DENIED.

2. Lindsey's Motion for Severance and for Disclosure of Co-Defendant's Statements [Docket No. 114] is DENIED.

3. Lindsey's Motion to Suppress Statements with Incorporated Legal Authority [Docket No. 119] is DENIED.

4. Raleigh's Motion for Suppression of Evidence Obtained by Search and Seizure [Docket No. 71] is DENIED.

5. Raleigh's Motion to Suppress Statements with Incorporated Legal Authority [Docket No. 72] is DENIED.

6. Raleigh's Motion for Severance and for *In Camera* Review of Co-Defendant's Statements [Docket No. 80] is DENIED.

Dated: November 22, 2010

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge